THOMAS J. ARNOLD et al.

v.

FREDERICK F. SEARING et al.

[Submitted October 1st, 1910. Decided December 15th, 1910.]

1. Persons who originated and executed a plan to transform the securities of one company into the stock and bonds of a new corporation formed by them involving a nearly complete change of the personnel of owners, and the organization of a syndicate to execute the plan, were promoters of the new company, as affecting their liability to stockholders thereof on account of undisclosed profits.

2. A corporate promoter occupies a fiduciary relation to the company, though he is not, strictly speaking, its agent or trustee before incorporation.

3. A corporation's promoters are accountable to it for moneys secretly obtained by them from it.

4. Corporate promoters must provide an independent and impartial board of directors.

5. Corporate promoters were bound to disclose to prospective shareholders any profit they were to make out of the transaction.

6. "Secret profits," which promoters are prohibited to make, are such profits as are made without disclosure to the real parties in interest, and obtaining their express or implied consent.

7. A corporation cannot be held to have consented to profits derived by its promoters, where the promoters dominated the board of directors.

8. Subscribers to a syndicate organized by promoters of a corporation to take over the stock of another corporation became, with the promoters, equitable stockholders in the new corporation, and as such were entitled to be informed by the promoters of all details of the operation and of the amount of profit which they were making.

9. Subscribers to a syndicate organized by promoters of a corporation to take over the stock of another corporation were not chargeable with notice that the promoters would derive twenty per cent. of a bond issue and sixty per cent. of the stock issue as compensation for their service, because a circular issued made it possible to deduce the fact that on satisfying the syndicate subscribers that amount of bonds and stock would remain.

10. A bill lies by stockholders and the receivers of an insolvent corporation against its promoters, and the corporation to recover, in its name, secret profits made by the promoters.

11. Promoters of a corporation held for secret profits made, should not be charged with stock profits where the subscribers considered the stock as without actual value and it was a bonus in which all the stockholders participated.

12. Stockholders and receivers of a corporation, no creditors appearing, are estopped from asserting invalidity of stock issued to all subscribers as a bonus.

13. Active promoters of a corporation organized to take over another corporation are jointly and severally liable for secret profits made by the promoters, consisting of bonds of the corporation, but one who was made a participant in the profits principally to reimburse him for extra effort by him as president of a trust company involved in the organization plan, is liable only for the profit received by him.

14. A corporate promoter *held* for secret profits made in stock and bonds of the corporation is not entitled to credit for stock and bonds voluntarily surrendered to save the corporation from insolvency; the securities not appearing to have been received otherwise than as a gift.

---

On final hearing. On bill, answer, replication and proofs.

The bill in this case is filed by stockholders of the Passaic Steel Company against Fairchild, Searing and Bell, who, it is claimed, were the promoters of that company, to recover in its name moneys which, it is alleged, were secret and undisclosed profits made by the defendants in the process of promoting the corporation. The facts are as follows:

The Passaic Rolling Mill Company was organized in 1869 with a share capital of $200,000. It became the owner of a large plant at Paterson, and for many years conducted its business profitably. Some time in the early part of 1902 the stockholders gave to one Samuels options for the purchase of their holdings of the company's stock, which options expired on June 23d of that year without having been exercised or accepted. By instruments dated June 26th and 27th, 1902, options were again

given by the stockholders to Albert C. Fairchild for all the stock of the company with the exception of a few shares which belonged to an estate of which he, Fairchild, was one of the executors, and his own stock; options for these blocks of stock were taken in the name of the defendant Searing. By the option agreements it was provided that the stockholders would sell their shares of stock in the rolling mill company at $750 per share, although some of the stockholders gave options at $700 per share; the stock was to be deposited with the Citizens Trust Company on or before July 1st, 1902, properly endorsed for transfer, with directions to the trust company to deliver to Fairchild such certificates of stock upon payment therefor in cash. Fairchild agreed to deposit with the trust company five dollars a share for each and every share of the capital stock of the rolling mill company, the same to be paid to the shareholders when its entire capital stock should be deposited with the trust company under the option agreements, as part of the purchase price of the shares, and to be forfeited by Fairchild upon his failure to pay to the shareholders the balance of the purchase price on or before November 1st, 1902. There was also a provision for the extension of the time of performance for a period of two months from November 1st, 1902, upon payment by Fairchild of an additional sum of five dollars per share, such sums to be likewise forfeited upon failure to pay to the shareholders the balance of the purchase price as therein set forth. Mr. Fairchild was formerly connected with the rolling mill company as a director and one of its employes. He states that he procured the options for the rolling mill company stock at the instance of one James D. Lazelle but for the Transit Finance Company, with which Lazelle was connected, and that although the options were taken in his name he had at that time no interest in them, but that they were taken by him solely for the account of the Transit Finance Company. The defendant Searing was interested in the project at that time because not only were at least two of the options taken in his name, but also on the day on which the earliest of the options was dated, namely, June 26th, 1902, an agreement was entered into between the Transit Finance Company and Mr. Searing, by which it was recited that whereas

the finance company had acquired or was about to acquire the ownership of options on all the stock of the rolling mill company, and had formed or was about to form a corporation to be known as the Passaic Steel Company, with a capital of $5,-000,000 and an authorized issue of bonds of $2,500,000, which company, when organized, would purchase all the shares of stock of the rolling mill company and pay for the same by the issuance and delivery to the finance company of all its capital stock and the total amount of its authorized issue of bonds, and that Searing had assisted in the procuring of those options, and was desirous of aiding the finance company in the organization of the new company and in the sale and disposal of a part of the said securities of the new company when issued, and that the finance company proposed to dispose of $2,000,000 face value of the bonds at not less than ninety-five per cent. of their par value, with an equal amount of stock as bonus, it was agreed between the finance company and Searing, first, that Searing would assist the finance company in the organization of the steel company and in the purchase by it of the property and plant of the rolling mill company, by the acquisition of all the shares of the rolling mill company by the steel company, and in the sale by it of $2,000,000 face value of the steel company's bonds, when issued, and by purchasing the whole or part of said bonds or causing the same to be purchased or marketed. In consideration of this assistance the finance company agreed to allow or pay to Searing for his services rendered and to be rendered one-half of the profits realized by the finance company, whether the same should be in cash or in the stock of the steel company, which profit should be ascertained by deducting from the proceeds of the sale of $2,000,000 of bonds at ninety-five per cent. the amounts paid by the finance company on its options to purchase the stock of the rolling mill company, which amount was estimated to be not less than $1,439,750, besides commissions allowed or payable, and any and all expenses and disbursements incurred in the purchase of the stock of the rolling mill company and the sale of the securities of the steel company. It thus appears that on June 26th, 1902, the plan of transforming the securities of the rolling mill company had been formulated, and the division of the antici-

pated profits provided for between the transit company and Searing, who, so far as the papers in the case show, were the only parties interested in the project up to that time.

On July 10th, 1902, an agreement in writing was made between the three defendants, Searing, Fairchild and Bell, the recitals in which throw great light upon the transaction. It was recited that the three defendants were then engaged in the formation of a syndicate for the purpose of acquiring the plant and business of the rolling mill company, which syndicate was to be known as the Passaic Steel Syndicate, and was to be divided into two hundred shares of $9,500 dollars each; that it was contemplated that the cash profit arising from the formation of the syndicate would amount to the sum of $400,000 or thereabouts, and that the stock profit would amount to $3,000,000 face value of the capital stock of the new company; that by previous agreement this cash and stock profit was to be equally divided between the finance company and Searing; that Searing desired to share the profits that he might receive with Fairchild, Bell and Lazelle; it was agreed that if the entire two hundred shares of the syndicate should be sold, Searing should distribute the profits that he might receive as follows:

(1) That he should pay and deliver to Lazelle $25,000 from the cash profits, and $100,000 face value of the stock profits.

(2) That he should pay and deliver to the defendant Bell one-quarter of the cash and stock profits which might remain.

(3) That one-half of the remainder should be paid to Fairchild; and

(4) That Searing should retain what was left.

It appears that this agreement was destroyed and an oral agreement substituted, having the same terms as the original agreement except that by the oral agreement Bell was to get one-third of the total profits after the payment to Lazelle, instead of one-quarter thereof.

On July 15th, 1902, the finance company made an agreement with the Citizens Trust Company, which recited that Searing and Fairchild had acquired the ownership of options to purchase all the shares of the rolling mill company, and that they, in conjunction with the finance company and certain other persons,

were about to form a corporation to be known as the Passaic Steel Company, with a capital stock of $5,000,000 and an authorized issue of bonds of $2,500,000, $2,000,000 of which bonds were to be exchanged in partial payment for the capital stock of the rolling mill company, and $500,000 of said bonds to be reserved for improvements; said company, when organized, to purchase all the shares of the rolling mill company by exchanging its capital stock for the capital stock of the Passaic Rolling Mill Company on the basis thereinafter mentioned, and that in order to dispose of the bonds it was proposed to form a syndicate to be known as the Passaic Steel Syndicate, of which the trust company should be the sole manager; said syndicate to be divided into two hundred shares of $10,000 each, the holder of each syndicate share to be entitled to receive, when issued, upon the payment of $9,500 in cash, $10,000 in first mortgage five per cent. bonds of the Passaic Steel Company, and one hundred shares of the capital stock thereof as a bonus, and that the present stockholders of the rolling mill company had deposited their entire holdings with the said trust company in accordance with their options, and that Fairchild and Searing were bound to pay to the rolling mill company's stockholders $1,439,750 in cash on or before November 1st, 1902, unless the time for the payment should be extended, and that the finance company had paid to the trust company the sum of $10,000, which sum had been paid by the trust company to the stockholders of the rolling mill company as part payment on the options, and that it was proposed to pay the said sum of $1,439,750 to the present stockholders of the rolling mill company from the proceeds of the sale of the syndicate shares of the steel syndicate; it was agreed:

(1) That the trust company should be the sole recipient and custodian of the money derived from the sale of the shares of the syndicate.

(2) That the shares of the syndicate should only be offered for sale through the trust company and the finance company.

(3) That the trust company should pay to the stockholders of the rolling mill company, from the proceeds of the sale of the syndicate, the sum of $1,439,750, taking in exchange therefor the entire capital stock of the rolling mill company.

(4) That after the payment thereof the entire capital stock of the rolling mill company should be transferred to the trust company, excepting that one share should be transferred to Fairchild, one to Searing and one to Bell, who should be elected directors of the rolling mill company.

It was further provided that these parties when so elected directors of the rolling mill company should proceed to organize the steel company, with its capital stock as above agreed; and that then the two companies should be merged into one corporation, to be known as the Passaic Steel Company; the new company should immediately authorize the execution of the bonds, with the mortgage to secure the same, and that the trust company should divide the stock of the steel company as follows: twenty thousand shares to the members of the syndicate, fourteen thousand nine hundred and twenty-five shares to the Transit Finance Company, and fourteen thousand nine hundred and twenty-five shares to Searing, in part compensation for their services in the transaction. It was likewise provided that the trust company should receive a commission, not to exceed $19,000, for its services, and that it should return to the finance company the sum of $10,000 which that company had advanced to the stockholders of the rolling mill company, and after satisfying the legal expenses of the transaction should pay one-half of whatever sum might remain to the finance company, and the remaining half to Searing, as additional compensation for their services in assisting to place the shares of the syndicate.

These agreements embody a specific and distinct plan for the transfer of the property and assets of the rolling mill company to the steel company, and a complete change of ownership of the shares therein. The profit thereon, in case the enterprise should succeed, was thus ascertained, and each man's interest therein provided for long before anyone was obligated to the extent of a dollar, excepting the agreement of the finance company to pay five dollars on each share of the rolling mill stock as a portion of the purchase price thereof. The parties who were interested in the profits of the transaction were the finance company, Lazelle, Fairchild, Searing and Bell.

On August 2d, 1902, the steel syndicate prospectus was dated

and issued. This was an invitation to the public to subscribe to the syndicate shares at ninety-five per cent. of their par value. Appended to it is an agreement dated August 2d, 1902, between the trust company, manager of the syndicate, of the one part, and the subscribers thereto, of the other part, which recited that the trust company itself, and in connection with other parties, for whom.it acts as agent, had secured the right to the control of $2,000,000 of first mortgage five per cent. bonds, and $2,000,-000 of the capital stock of a company about to be formed, to be known as the Passaic Steel Company, to be capitalized as stated in the plan annexed; and that the parties desired to form a syndicate to purchase the said securities; it was agreed that the syndicate should be divided into two hundred shares of $9,500 each, each syndicate share to entitle the holder thereof, on payment of $9,500 in cash to the manager, to receive, when issued, $10,000 face value of the first mortgage five per cent. bonds of the Passaic Steel Company, and one hundred shares of its capital stock. The subscribers covenanted to take the number of shares so subscribed for by them respectively, they paying ten per cent. down and agreeing to pay the remainder upon ten days' call. The agreement contains a provision for the relief of the syndicate in case any subscriber should fail to perform his undertakings, reserving the right to reject or reduce the subscriptions and to cancel any or all in case they should for any reason decide to abandon the enterprise.

It does not appear at what particular time sufficient subscriptions were obtained to justify the parties interested in proceeding with the enterprise, but on September 16th, 1902, the defendants Searing, Fairchild and Bell signed a certificate, under the General Corporation law, for the organization of the Passaic Steel Company. This certificate was recorded in the clerk's office of the county of Passaic on the same day, and on September 18th, 1902, was filed with the secretary of state; it authorized the company to issue capital stock to the extent of $3,000, divided into thirty shares of the par value of $100 each, and each incorporator subscribed for ten shares. On October 9th, 1902, the same incorporators executed an amended certificate of incorporation, which was recorded in the office of the clerk of

the county of Passaic on February 10th, 1903, and filed in the
office of the secretary of state on February 16th, 1903; by it
the total authorized capital stock was made $5,000,000, divided
into fifty thousand shares of the par value of $100 each. The
actual organization of the Passaic Steel Company took place on
February 16th, 1903. At that time six directors were elected, con-
sisting of the three defendants and George A. Lee, Dudley
Phelps and J. Barclay Cooke; a directors' meeting was held on
the same day, at which the defendant Fairchild was elected presi-
dent, the defendant Searing vice-president, and J. Barclay Cooke
secretary and treasurer.

In the meantime, and early in November of 1902, the Citizens
Trust Company, having in its possession properly endorsed for
transfer all the certificates of stock of the rolling mill company,
transferred qualification shares to the three defendants and Fred-
erick W. Cooke and J. Barclay Cooke, all of whom were elected
directors; the defendant Fairchild was elected president, and J.
Barclay Cooke secretary, and thus the boards of directors of the
two corporations remained until the execution of the merger
agreement. Up to that time the directors of the two companies
had not yet paid anything for their stock. The stockholders of
the rolling mill company were the three defendants and Dudley
Phelps, George A. Lee, J. Barclay Cooke, and the Citizens Trust
Company as trustee for the syndicate subscribers; and the stock-
holders of the steel company were the three defendants and Dud-
ley Phelps, George A. Lee and J. Barclay Cooke.

The merger agreement, provided for in one of the preliminary
contracts, was executed on February 16th, 1903; by its terms
the two corporations were consolidated into a single corporation,
under the name of the Passaic Steel Company. Its first board
of directors consisted of the three defendants and George A. Lee,
Dudley Phelps and J. Barclay Cooke. The merger agreement
provided that the capital stock of the consolidated corporation
should be $5,000,000, divided into fifty thousand shares of the
par value of $100 each, and that these shares should be appor-
tioned among and issued to the stockholders of the said merged
corporation, according to the shares held by the respective stock-
holders of the said two corporations, as the same appeared on

their books respectively, that is to say, the stockholders of the Passaic Steel Company should retain the shares to which they were then entitled in the company, and the stockholders of the Passaic Rolling Mill Company should be entitled to forty-nine thousand nine hundred and seventy shares of the capital stock of the steel company, and that each of the Passaic rolling mill stockholders should also be entitled to $1,000 in first mortgage five per cent. bonds of the consolidated corporation for each share of the stock of the rolling mill company then held by him. .

The company then proceeded to issue its bonds to the amount of $2,500,000, and to execute a mortgage to the Citizens Trust Company upon all the consolidated corporation's property to secure the payment of the same, and it was not until that time that there was or could have been any exchange of the securities; this exchange was made by the Citizens Trust Company; it gave to the syndicate subscribers their respective amounts of bonds, with an equal amount of stock as a bonus, and when the distribution was finished there remained about $400,000 in bonds and $3,000,000 in stock which was the profit on the transaction, and which went to the finance company, Lazelle and the three defendants, in the proportions which had been previously agreed upon.

It must be said on behalf of the defendant Bell that he was more or less a passive member of the board of promoters. He was taken into the scheme principally on account of his standing as a financier and president of the trust company which was selected as the depository of the securities. He seems to have had nothing to do with obtaining the options for the rolling mill stock, and little, if anything, to do with procuring syndicate subscriptions, what he did being merely the duties that he would have been called upon to perform as president of the trust company if he had not belonged to the board of promoters. The active work was done by Fairchild, Searing, Lazelle and the finance company.

*Messrs. Humphreys & Sumner* and *Mr. Robert H. McCarter,* for the complainants.

*Mr. John W. Harding,* for the defendants Fairchild and Searing.

*Mr. Francis Scott* and *Mr. Gilbert Collins,* for the defendant Bell.

*Mr. Albert Comstock,* for the Passaic Steel Company.

*Mr. William B. Gourley,* for the receivers of the Passaic Steel Company.

HOWELL, V. C.

In order to determine whether the defendants are or are not to be characterized as promoters, it is sufficient to carefully consider what they did in connection with the enterprise now under examination. They undertook to transform the securities of the rolling mill company from a stock issue to a stock and bond issue, to increase these securities from $200,000 to $7,500,000, without the addition of a dollar to the assets of the company, and to make a nearly complete change in the personnel of the real owners of the property. To effectuate this result they decided by agreement between themselves upon all of the details of the plan, and calculated the amount of profit which they would make out of the transaction, and ascertained and set down in writing each man's share thereof long before they made any portion of the scheme public; they organized a syndicate which was to furnish all the funds necessary to carry out the scheme, the members of which were to be stockholders and bondholders of the new company, and practically made Mr. Bell sole manager by providing that the trust company, of which he was president, should be sole manager. They were the incorporators of the new company, which was provided for in their scheme, and they became the first stockholders and directors thereof, although they paid nothing for the stock which gave them control of its management, and they executed the amended certificate of incorporation to make the charter conform to the plan which they had settled upon weeks before. They caused themselves to be elected stockholders and directors of the rolling mill company, and as

stockholders and directors of the two companies they joined in
the execution of the merger agreement which contained the final
formulation of their plan. They, with the possible exception of
Mr. Bell, busied themselves for a long period in procuring syndi-
cate subscribers, and to some extent at least used their personal
influence to procure subscriptions. By the fifth paragraph of
the syndicate agreement they reserved to themselves the right to·
abandon the whole enterprise if they saw fit. In short, they orig-
inated the plan and carried it out. Whatever was done was done
by them with the aid of Lazelle and the finance company. With-
out the defendants the scheme would not have been conceived
and could not have been carried through. These facts, in my
opinion, put the defendants upon the footing of promoters of the·
steel company and subjected them to all the liabilities and respon-
sibilities which that important function casts upon them under·
the rules of law. *Woodbury Heights Land Co.* v. *Loudenslager,.
55 N. J. Eq.* (*10 Dick.*) *'78; affirmed, 58 N. J. Eq.* (*13 Dick.*)
*556; Plaquemines Tropical Fruit Co.* v. *Buck, 52 N. J. Eq.*
(*7 Dick.*) *219; Dickerman* v. *Northern Trust Co., 176 U. S.
181; Pittsburgh Mining Co.* v. *Spooner, 74 Wis. 307.*

It will be observed that a promoter, when he shall have been.
found to be such as a matter of fact, is a sort of self-constituted
agency for bringing a company into existence, and this fact alone·
would go far toward charging him as a fiduciary. He has in his·
hands the creation and molding of the company; he has the power·
of defining how and when and in what shape and under what
supervision it shall start into existence and begin to act as a trad-
ing corporation. It is he who selects the directors,· to whom he·
gives such power as he chooses; it is he who settles the regulations
of the company, regulations under which the company, as soon
as it comes into existence, may find itself bound to anything not
in itself illegal, which the promoter may have chosen. This con-·
trol of the promoter over the company, so plenary and absolute,
involves a correlative responsibility, and out of this responsibility
arises the doctrine now well settled of the fiduciary relation of the
promoter toward the company he creates. This fiduciary rela-
tionship of the promoter is an extension of the doctrine of agency,
a sort of agency by anticipation, for the promoter is not, strictly

speaking, an agent of or trustee for the company before incorporation, but it is a salutary and necessary fiction of equity for the protection of the company. In virtue of this fiduciary relationship the promoter is accountable to the company for all moneys secretly obtained by him from it. Secrecy is the gist of the wrong. The law does not say a promoter may not make a profit out of a company he promotes, provided he makes a full and fair disclosure to the company of what he is getting, and the company assents to it.

As promoters it was their duty to provide an independent and impartial board of directors (*Plaquemines Tropical Fruit Co.* v. *Buck, 52 N. J. Eq.* (*7 Dick.*) *219*), and to disclose to the persons who were about to become shareholders what profit, if any, they were to make out of the transaction. It is universally held that promoters of a corporation have no right to make secret profits. See v. *Heppenheimer, 69 N. J. Eq.* (*3 Robb.*) *72; Groel* v. *United Electric Company of New Jersey, 70 N. J. Eq.* (*4 Robb.*) *622; Bigelow* v. *Old Dominion Copper Co., 74 N. J. Eq.* (*4 Buch.*) *496; Old Dominion Copper Co.* v. *Bigelow, 203 Mass. 159.* By secret profits is meant such profits as are made by the promoter without disclosing the same to the real parties in interest and obtaining their consent, either express or implied.

In this case the promoters did make a profit of about $400,000 in bonds and $3,000,000 in stock. That is to say, in the manipulation of the property, and the securities representing it, they were enabled to withdraw from the company twenty per cent. of its bond issue and sixty per cent. of its stock issue, for which they paid nothing, and for which they rendered no service, except such service as was necessary to put through the operation by virtue of which they were enabled to make the profit. They claim that at the time this was done, to wit, on February 16th, 1903, everybody in interest consented thereto, and that therefore there can be no liability. To this, however, there are two answers. In the first place, the company cannot be held to have consented, for the reason that the promoters did not provide it with an independent board of directors who might look after its interests, but, on the contrary thereof, they placed themselves in the dual position of directors whose duty it was to watch over

the affairs of the corporation, and promoters who had an interest only in obtaining the largest prossible profit from the operation.

Lord O'Hagan, in *New Sombrero Phosphate Co.* v. *Erlanger, 3 A. C. 1218; 48 L. J. Ch. 73*, speaking of directors so appointed and selected, says: "If the directors were nominated merely to ratify any terms the promoters might dictate, they discharged their functions. If it was their duty, as it certainly was, to protect the shareholders, they never seem to have thought of doing it; their conduct was precisely that which might have been anticipated from the character of their selection, and, taking that conduct and character together, I concur in, I believe, the unanimous opinion of your lordships, that such a transaction cannot be allowed to stand. The promoters who so forgot their duty to the company they formed as to give it a directorate without independence of position, or vigilance or caution in caring for its interests, which were accordingly subordinated to their own, misused their power and must take the consequences." In the second place, the real parties in interest, as opposed to the interests of the promoters, were the syndicate shareholders who had furnished or had agreed to furnish the actual cash with which the promoters' operation was carried on; they were not notified in any manner of the amount that the promoters were expecting to make. They severally became equitable stockholders in the new corporation, as soon as they had subscribed to the syndicate shares, and it had been determined that the operation would be carried on; they were, with the promoters, the equitable owners of the stock, and as such were entitled to be informed by the promoters of all details of the operation and of the amount of profit which they were making. Vice-Chancellor Leaming so held when this case was before him on demurrer to the bill that was originally filed. *Arnold* v. *Searing, 73 N. J. Eq. (3 Buch.) 262.*

On the same point the present chancellor says, in the *Bigelow Case, 74 N. J. Eq. (4 Buch.) 457:* "In many cases promoters in anticipation of the formation of the company themselves buy property in order to make it over to the company upon formation. Whether the company in such cases is entitled to claim the benefit of the bargain made by the promoter is often a question of nicety, *and may depend upon whether the promoter buys the property*

*with his own money or with money that is in effect subscribed for the share capital. It may be thus in effect subscribed before the formation of the company, as is the case with many syndicates, in which event the promoter may be a trustee with respect to the property for the company thereafter to be formed, on the theory that the property was bought for the company."*

This remark applies with peculiar force to the case in hand. When the promoters took the options for the purchase of the rolling mill company's stock they did it with the idea of investing the new company with the title to the property which the stock represented, and at once made themselves to a certain extent trustees for the syndicate shareholders who furnished the funds for carrying out the plan. It therefore becomes evident that it was the duty of the promoters to make full disclosure to the syndicate subscribers of all the profit which they intended to make.

It was said on behalf of the defendants that full disclosure of all the facts was made in the circular which accompanied the syndicate agreement of August 2d, 1902, because it was possible for anyone to calculate from the data given that after the syndicate subscribers had been satisfied there would be left $400,000 in bonds and $3,000,000 worth of stock which must have been understood to belong to the promoters. It is quite true that such a calculation would show such a result, but it is not true that there is anything in the circular or in the agreement which would indicate in the slightest degree that this surplus was intended as promotion fees or that the defendants had any interest whatever in it. This point was touched upon in *Re Olympia, Limited, L. R. 1898; 2 C. D. 153; 67 L. J. Ch. 433.* Lindley, M. R., says: "The main question which has to be determined in this case is whether the documents to which I have referred contain a sufficient disclosure of that which it was the duty of the promoters to disclose to the company, and to those who were invited to join it. In considering this question we must recollect that we are dealing with matters of daily business and must have regard to the habits and practical necessities of ordinary business men. Refined equitable doctrines of constructive notice have little, if any, application to such matters as are now being dealt with. To inform a person of a fact is one thing; to give him the means of finding

it out, if he will take. trouble enough, is another thing.  A promoter of a company whose duty it is to disclose what profits he has made does not perform that duty by making a statement not disclosing the facts but containing something which, if followed up by further investigation, will enable the inquirer to ascertain that profits have been made, and what they amounted to."

I must therefore conclude that the profits made by the promoters in this case were not disclosed to either the corporation or to its real stockholders, and that they are liable to account for the same in an equity suit brought for the purpose.

The next question relates to the form of the suit.  The bill, as amended, is filed by three stockholders of the new company against the three defendants.  The corporation itself is likewise a party defendant.  The company became insolvent and its receivers were added to the suit as parties complainant.  Therefore, as the bill now stands, it is a bill filed by stockholders and by the receivers of the insolvent corporation, in which they attempt to enforce a cause of action which they claim runs to the corporation. In other words, they are prosecuting in the right of the corporation.  The defendants assert that the cause of action does not run in favor of the corporation, and that it, as a legal entity, has no interest in the transaction, and that taking the charge against the defendants at its utmost weight the corporation itself has no right or interest in the transaction to be protected.  The complainants' theory is that the defendants, while they were holding a fiduciary relationship toward the steel company, took and assisted others to take bonds of the corporation without consideration, whereby the indebtedness of the company was increased $400,000 and took $3,000,000 of the stock of the corporation, all without the knowledge of the company or the syndicate shareholders, and that the defendants should pay the value of the bonds and stock so taken, and that in this view the right of action accrues in favor of the corporation.  The point appears to have been decided adversely to the complainants' view by the supreme court of the United States in *Old Dominion Copper Mining Co.* v. *Lewisohn, 210 U. S. 206.* That was a bill in equity brought by the corporation to rescind a sale to it of certain mining rights and lands conveyed to the corporation by the defendants' testator, or in the alternative to re-

cover damages for the sale, and it was held that inasmuch as at the time of the sale the promoters and the promotion syndicate were on both sides of the bargain, everybody who then had an interest must be held to have consented to what was done, therefore the corporation consented, and therefore it could not afterwards complain; and that as to those stockholders who purchased stock directly from the company later on, their cause of action for the fraud which was committed upon them was a personal one in which the corporation had no interest. The cases which approve of this ruling are collected in the opinion of Mr. Justice Cornish, of the Maine supreme court, in *Mason* v. *Carrothers, 74 Atl. Rep. 1080*. If, however, the defendants are promoters, and by means of their machinations the corporation has been fraudulently deprived of a portion of its property, it would seem as if the cause of action for the recovery of the property is a cause of action in favor of the corporation. In *Plaquemines Tropical Fruit Co.* v. *Buck, supra,* the bill was filed in favor of the corporation, praying that its promoters might be compelled to surrender for cancellation some shares of its capital stock alleged to have been improperly issued to and held by them as such promoters, and to restrain them from voting thereon. It does not appear that any question was raised as to the right of the complainant corporation to sue; that seems to have been taken for granted. At any rate, the form of the action was acquiesced in and the decree on the motion was in the company's favor. The same course was pursued in *Woodbury Heights Land Co.* v. *Loudenslager, supra.* There the bill was filed by the corporation against the defendant, who was held to be a promoter, for an account and recovery of profits realized by him in the promotion. The decree required him to account to the corporation for the amount of profits that was actually received by him. I take it the doctrine contended for by the complainants on this branch of the case is settled in this state in favor of the corporation. The point is expressly held in Massachusetts in favor of the complainants' view in *Hayward* v. *Lesson, 176 Mass. 310*. There a bill was filed by the receiver of the East Tennessee Land Company to recover alleged secret profits made by the defendants as promoters of that corporation. Mr. Justice Loring says "that the corporation may sue for the secret profits

made by a promoter who secures a sale of lands from · a third person to the corporation without returning the lands obtained by means thereof, is well settled. *Emery* v. *Parrott, 107 Mass. 95; Lydney and Wigpool Iron Ore Co.* v. *Bird, 33 C. D. 85; Emma Silver Mining Co.* v. *Lewis, 4 C. P. D. 396,"* and the proceedings were amended by substituting the corporation in the place of the receiver as party complainant. This practice was followed in the same court in *Old Dominion Copper Mining and Smelting Co.* v. *Bigelow, 188 Mass. 315,* and in England in *New Sombrero Phosphate Co.* v. *Erlanger, 5 C. D. 73; 46 L. J. Ch. 425;* affirmed in house of lords, *3 A. C. 1218; 48 L. J. Ch. 73* and in *Re Leeds and Hanley Theatres (1902), 2 Ch. 809; 72 L. J. Ch. 1.*

The lord-chancellor, in the house of lords, in the *Erlanger Case,* calls special attention to the fact that the suit is in favor of the corporation. The decree eventually was in its favor. It was indeed admitted by one of the defendants in this case that the rule that the corporation might recover had been adopted in New Jersey. I must therefore say that the suit in its present shape is properly brought. It may be that when the moneys are recovered equities will arise on the distribution which will require solution, but we need not concern ourselves with that question at the present time.

The last question involves the principles upon which recovery may be had. It would not be just or reasonable to charge any of the defendants with the par value of the share capital taken by them, for the reason that all the syndicate subscribers who became shareholders in the new company considered the stock to have no actual value, and that it was purely and simply a bonus in which all the stockholders participated. The shareholders who are complainants in this suit received their shares upon this basis. As syndicate subscribers they were entitled to bonds · at ninety-five per cent. · This amount they put in in cash and the stock was a mere gratuity. All the stock stands on this footing. The complainants and the company are thus estopped from asserting the invalidity of the stock, and inasmuch as there do not appear to be any creditors, the receivers are estopped also. *2 Cl. & M. Corp.* § *393; Knoop* v. *Bohmrich, 49 N. J. Eq. (4 Dick.) 82; 50 N. J. Eq. (5 Dick.) 485; Breslin* v. *Fries-Breslin Co., 70 N. J. Law*

(41 Vr.) 274.   I .therefore think that there should be no accounting for any of the stock profits which were made by the promoters.

The defendants Fairchild and Searing are undoubtedly liable, jointly and severally, for all the profits made by the promoters, in so far as that profit consisted of bonds of the corporation, and were it not for the view which the court of errors and appeals took of the defendant's liability in the *Loudenslager Case,* I would think that Mr. Bell might, on principles of equity, be charged equally with them.   I must adopt Chancellor Pitney's interpretation of the *Loudenslager Case* in his opinion in the *Bigelow Case, supra,* and charge Mr. Bell only with the amount of profit that was received by him.   There is some justice in the application of the rule in the *Loudenslager Case* to the case of Mr. Bell, for the reason that he stands somewhat apart from the other two defendants in his attitude toward the promotion scheme and in his. relation to the transaction.   As I have elsewhere said, he seems to have done little, if anything, more than he would have been required to do as president of the trust company;   he was made a participant in the profits principally to reimburse him for extra. labor and effort to which he would be put in that capacity.

It appears that many months after this transaction was entirely completed the company came into financial difficulties, and that in order to save it from insolvency, Mr. Bell and other stockholders and bondholders surrendered to the company a large amount. of stock and bonds to aid it in its financial distress.   It was claimed on the part of Mr. Bell that in any accounting to which he might be subjected, he should be credited with the amount of stock and bonds which he so surrendered.   My view of the relation of the stock to the whole enterprise hereinabove stated would preclude any credit to Mr. Bell on this account.   I reach the same conclusion as to the bonds surrendered by him, but for an entirely different reason.   He is called upon to account for what he received at the time he received it, and he is chargeable as of the time when the bonds were issued to him.   If he saw fit afterwards to give the bonds back or to employ them in some other manner for the advantage of a sinking company, he cannot have credit therefor without the consent of the parties interested.   There is.

no claim that at the time the bonds were donated by him to the company or used by him for its benefit the company released him from liability or accepted the bonds on account of his indebtedness or did otherwise than to take them as his free gift. Hence there can be no set off, either legal or equitable. This is made still more manifest when we consider the intervention of the receivers. *Williams* v. *Traphagen, 38 N. J. Eq. (11 Stew.) 57; McManus-Kelly Co.* v. *Pope Manufacturing Co., 70 Atl. Rep. 297.*

I will therefore advise a decree against Mr. Fairchild and Mr. Searing, jointly and severally, for the full amount of the promoters' profits, and against Mr. Bell in the same manner, but only to the extent to which he profited by the transaction. If the amounts cannot be agreed upon by counsel there will be a reference to ascertain the same.