WILLIAM R. HENDERSON, ALBERT R. BUDD, WALTER J. WILSON
and FLOYD B. LOCKHARDT, and others, Interveners,

*vs.*

PLYMOUTH OIL COMPANY, a corporation organized and existing
under the laws of the State of Delaware, MICHAEL L. BEN-
EDUM, SARAH N. BENEDUM, JOSEPH C. TREES, TREES DE-
VELOPMENT COMPANY, LIMITED, LEVI SMITH, JEROME G.
FARQUHAR, WILLIAM E. HUSTON, EDWARD C. STEARNS,
THOMAS R. COWELL, WALTER S. HALLANAN, FOSTER B. PAR-
RIOTT, ADDISON F. HOLLIDAY, JR., CHARLES ADAMS, H. B.
DAVENPORT, JOHN LAING, JOHN M. HOLLIDAY, RAY V. HEN-
NEN, JOHN S. HANLON, ADDISON B. DALLY, JR., OVID D.
ROBINSON, ELLSWORTH D. ROBINSON, J. L. KIRKLAND, H.
D. McCRACKEN, M. E. DAVIS, ARTHUR G. FLORES, D. A.
McCASKEY, C. H. HUSTON, ANNE A. ADAMS, THOMAS R.
COWELL, BETTY COWELL, NILES W. BOTTOMFIELD and
SAMUEL M. DUNBAR.

*New Castle, Dec. 27, 1926.*

*Caleb S. Layton*, of the firm of Marvel, Layton, Hughes & Morford, and *Owen J. Roberts*, of Philadelphia, Pa., and *Charles M. Throp*, *W. D. Stewart*, *Earl F. Reed*, and *Charles M. Throp, Jr.*, all of Pittsburgh, Pa., for complainants.

*Andrew C. Gray*, of the firm of Ward, Gray & Ward, *John W. Davis*, of New York City, *H. D. Rummel* and *Fred O. Blue*, both of Charleston, W. Va., and *John S. Weller* of Pittsburgh, Pa., for defendants. ·

THE CHANCELLOR. This cause was before me on another occasion when a motion for preliminary injunction was heard and disposed of, *ante p.* 40, 131 *A.* 165. The showing then made was upon affidavits. The case as now presented on final hearing is, according to the contentions of the complainants, a different one in its fact aspects from that which appeared on the affidavits and therefore is entitled to a disposition of a different character from that which the opinion filed at the preliminary injunction stage would indicate.

I shall not burden this opinion with a repetition of the facts and circumstances which were recited in some detail in the statement of facts preceding the opinion heretofore filed and above referred to. That recital of facts and such fact statements and assumptions of fact as appear in the opinion itself are now accepted as the facts found in the case on final hearing except in so far as the same may be supplemented or altered by the statements of fact herein made.

When the Stearns group acquired the Pickerell interests, they planned to organize a corporation (which turned out to be the Plymouth Oil Company) to take over the interests thus acquired and tentatively planned its corporate structure in which a preferred stock issue of one hundred and fifty thousand shares was projected to be sold to raise working capital. The personnel of officers,

and directors of the proposed company was at that time almost, if not entirely, agreed upon by the promoters.

The contract between Stearns and Pickerell was agreed upon on October 5, 1923, but not formally executed until October 8, 1923, the interval being required to reduce its terms to writing and to such formal shape as would meet the desires of all the parties concerned.

When the contract of sale was made between Stearns and the Plymouth Oil Company on October 22, 1923, Davenport for himself and Laing, had prior thereto agreed to invest $50,000 in stock of the corporation. At that time neither Davenport nor Laing was informed of the fact that Stearns and his associates were to receive the amount of common stock they did, though Davenport, who was acting for both, knew that the Stearns group had acquired the Pickerell interests and proposed to turn them over to the corporation. Neither Davenport nor Laing is complaining in this suit.

All the other subscribers to the preferred stock came into the corporation subsequent to the date of the Stearns-Plymouth Oil contract; that is, subsequent to October 22, 1923, the earliest one being the complainant, Lockhardt, who subscribed on November 2, 1923.

When Stearns made his offer to the Plymouth Oil Company on October 22, 1923, he had a present right to the Big Lake Oil Company's stock which the offer referred to, but he did not at that time hold any contracts and rights affecting the 12,280 acres of oil and gas properties in Pecos and Upton Counties, Texas, referred to in the offer. The Pecos County rights were not actually acquired until November 29, 1923, the contract evidencing such rights being ante-dated to September 29, 1923. It is claimed by the defendants that while the Pecos County rights were not evidenced by writing until November 29, yet there was a parol agreement covering such rights prior thereto. But the weight of evidence does not support this claim. The Plymouth Oil Company as a matter of fact, however, did eventually acquire from Stearns all the rights to the Pecos and Upton Counties properties which the Stearns letter offered. But before the Plymouth Oil Company actually received these rights, preferred stockholders, including

some if not all of the complainants and interveners, had subscribed and paid for stock.

Though the Stearns offer was made on October 22 and accepted that day, yet the common stock of the Plymouth Oil Company was not actually issued to him or his nominees until November 19, 1923, prior to which date, but after the offer and acceptance, some of the complainants and interveners had become subscribers to, and had paid for, shares of the preferred stock.

Some at least of the complainants and of the interveners did not know of the amount of common stock which was issued to Stearns and his associates at the time they subscribed for their stock, their first knowledge thereof being obtained at the stockholders' meeting held in June, 1925. They did know, however, that Stearns and his associates would receive some common stock.

The foregoing statements of fact include all that need be made by way of addition to or alteration of the fact situation as disclosed by the affidavits filed at the preliminary injunction stage.

On the facts as now found, what is the effect which the law attributes to them? This question will now be answered.

As I view the case, it is not necessary for me to discuss the question of the right of future stockholders contemplated by promoters of the corporation to be brought into its membership to call the promoters to an account for so-called profits made by the promoters in connection with a sale by them to it at a time when the corporation was composed entirely of themselves and was in their complete control. I say this because I shall assume for the purpose of this case that the point of view of the complainants on this point is sound, viz., that the complainants and interveners, though they came into the corporation after the Stearns-Plymouth contract was entered into, have such standing in equity as entitles them to maintain their bill in behalf of the corporation if on the facts a good cause of action is otherwise shown.

Whether such good cause of action against the defendants as promoters of this corporation is shown depends of course on whether there was a breach by the defendants of any fiduciary duty owed by them to the corporation. Before this question is answered, the primary inquiry must first be made—what is the nature of that duty, the breach of which is complained about?

In answering that question, it is of the utmost importance to fix the point of time in the various steps of the promoters' activities when the duty may be said to arise. If the promoters were under fiduciary obligations to a proposed corporation at the moment they acquired properties or rights to property which the corporation was to take over, and the circumstances are such as to show that they were acting in the capacity, actual or *quasi*, of agents purchasing for and on behalf of the proposed corporation, then considerable and very respectable authorities hold that the rules obtain which are applicable to the dealings of an agent for his principal. The promoters in such case are bound to account according to the settled principles of law attaching to that relationship. Among these principles is the familiar one that any profit or personal advantage gained by the agent at the expense of the transaction which he puts through in behalf of his principal belongs to the principal, no matter how profitable for the principal the transaction, even after subtracting from it the agent's gain, may in point of fact prove to be. This is the rule which the complainants contend for as governing this case. In support of it they cite the following cases: *Plaquemines Tropical Fruit Co. v. Buck*, 52 *N. J. Eq.* 219, 27 *A.* 1094; *Woodbury Heights Land Co. v. Loudenslager*, 55 *N. J. Eq.* 78, 35 *A.* 436; *Arnold v. Searing*, 78 *N. J. Eq.* 146, 78 *A.* 762, 767; *Burbank v. Dennis*, 101 *Cal.* 90, 35 *P.* 444; *South Joplin Land Co. v. Case*, 104 *Mo.* 572, 16 *S. W.* 390; *Yeiser v. U. S. Board & Paper Co.*, (*C. C. A.*) 107 *F.* 340; *Yale Gas Stove Co. v. Wilcox*, 64 *Conn.* 101, 29 *A.* 303, 25 *L. R. A.* 90, 42 *Ann. St. Rep.* 159.

If, however, the act of the promoter in acquiring the property cannot be said to have been the act of one acting in the fiduciary character of an agent for the future corporation, then the duty under which he rests when the corporation is later formed and made by him to purchase his property is of a different character. It then amounts to no more than this, that he shall make a sale which in its terms is fair and just. If as a consequence of that sale the promoter makes a profit, yet the corporation cannot complain provided the price to it was a just and fair one. Indeed, I do not understand the complainants seriously to question the correctness of this view. They do, of course, contend that the duty resting on

the promoters under the facts of this case is not a duty whose complexion is derived from the relationship simply of promoter-vendors to the corporation of their creation, but rather a duty which acquires its nature from the relationship of persons making an anterior purchase for and on behalf of a proposed corporation. Such being the case, they contend that the principle of law last referred to has no applicability here.

Now, the complainants thus resting their case on the conception that when the Stearns group acquired the properties they did so as agents for the proposed corporation, it becomes necessary to determine whether the facts support that view.

The first observation to be made in this connection is, that the mere fact that when the promoters acquired the Pickerell interests they had in mind the promotion of a corporation to take them over, does not establish the proposition that the acquisition by the promoters was on behalf of such corporation and in the course of an equitable agency. Vice-Chancellor Green in the New Jersey case of *Plaquemines Tropical Fruit Co. v. Buck, supra*, observed that—

" 'No rights, legal or equitable, arise in favor of a corporation in respect of transactions, whether complete or inchoate, merely because entered into in contemplation of the creation of such corporation,' and that it was open to Dr. Buck to buy the property on his own account, for any price he could, with the intention or in the hope of selling it at a higher price to a company to be formed, and, dealing independently, to sell it for such higher price to such company so long as he obtained his higher price fairly."

In another New Jersey case, *Woodbury Heights Land Co. v. Loudenslager, supra*, Vice-Chancellor Pitney noted with apparent approval a line of authorities which hold—

"that a party, being already the actual or potential owner of property, either by having the legal title vested in him or by holding it under contract with part of the consideration paid and mutual obligations to pay the balance of the consideration and to convey the property, may innocently promote and organize a company to buy it at an advance."

I find no case among the many cited which disagrees with the view thus announced in these two New Jersey cases. Whether, however, the facts present a case where the purchase by the promoters may be said to have been on their own account, or,

as observed by Vice-Chancellor Green in the *Plaquemines Tropical Fruit Co. Case*, above referred to, one that was made "on behalf of the future company, under such circumstance that the company, when formed, could say that the purchase made by him [the promoter] was made for the company," is, in the language of Chancellor Pitney in *Bigelow v. Old Dominion Copper Mining & Smelting Co.*, 74 *N. J. Eq.* 457, 71 *A.* 153, "often a question of nicety." This much seems to be clear, that, as just stated, the fact that the promoters intended the formation of a company to purchase from themselves does not in itself, though such intent definitely exists at the time of the acquisition by the promoters, stamp their activities with the unmistakable evidences of an agency on behalf of the future corporation.

In the instant case, I am unable to find anything in the facts warranting the view that the Stearns transaction with Pickerell was on behalf of the future corporation unless the circumstance that he then contemplated the formation of a corporation is alone allowed sufficient weight to support that view. Such circumstance alone, as I have said, is not sufficient.

But the complainants contend that there are other circumstances surrounding these transactions which, when added to the insufficient one just stated, are sufficient to fix upon Stearns the obligation of a fiduciary duty in connection with his acts of purchase of the properties. It is to be borne in mind that what Stearns sold consisted of three properties, the Pickerell interests, the Pecos County and the Upton County properties. In examining the contentions of the complainants concerning the other circumstances to which they refer as impressing upon Stearns' acquisitions the qualities of a fiduciary activity, it is necessary to segregate for the purpose of the discussion the Pickerell rights from the Pecos and Upton Counties rights.

First as to the Pickerell rights. It should be observed that none of the Pickerell properties was ever sold by Stearns to the Plymouth Oil Company, whose supposed grievances are here being asserted. They were sold by Stearns to Big Lake Oil Company in consideration of three-fourths of its capital stock and what Stearns sold to the Plymouth Oil Company was this Big Lake stock. Technically, therefore, whatever wrong was done was to the Big Lake

Oil Company and its stockholders, not to the Plymouth Oil Company, nor to the complainants who are its stockholders. But the complainants contend that this is only a technical view of the situation, that the formation of the two corporations, one a holding and the other an operating company, was originally contemplated as the advisable way to handle the Stearns acquisitions and that the complainants, as holders of Plymou h Oil Company's stock, are entitled in equity to regard the whole transaction as one in which Stearns was looking forward to gain his alleged illegal profits at their expense. That is to say, the complainants contend that the Big Lake Company as a separate entity is to be ignored and the matter here in controversy is to be regarded as one between the Stearns group and the Plymouth Oil Company whose rights the complainants seek to assert. Without stopping to discuss the matter, I shall for the purpose of the case accept this point of view as the correct one.

It is not necessary for me to repeat what I said in the opinion heretofore filed in this case touching the character of the rights acquired by Stearns from Pickerell and the binding nature of his obligations to Pickerell. Stearns was a purchaser in his own right and under personal obligation to carry out his contract. As before stated, the fact that he, when he became such purchaser on October 5, 1923, intended to form a corporation to purchase these rights cannot alone serve to convert his purchase into one made on behalf of the future corporation. The other circumstances to which the complainants refer as indicating the existence of a fiduciary obligation resting upon Stearns at the time of the purchase, might have some bearing on other legal aspects of the case which were touched upon at the argument but which it is not necessary to consider, but cannot have the effect of establishing the fiduciary relationship referred to. For instance, the circumstance that Stearns did not receive his Plymouth Oil Company stock until November 16th, by which time so-called innocent stockholders had come into the corporation, may have some significance if the question were as to when suit could be instituted to call Stearns to account for taking illegal profits if such were ever taken. But it cannot have any bearing on whether illegal profits were taken, or in anywise illuminate the question of what duties Stearns was rest-

ing under when the original acquisitions were made by him. Nor, touching this same question, is anything of helpful significance to be gathered from the fact that Davenport had on October 20th committed himself and Laing to a subscription of $50,000 in the stock of the new corporation. Such fact throws no light on the character of Stearns' previous purchase from Pickerell. If there had been a purchase by Stearns for the corporation, then Davenport's subscription prior to Stearns' sale to the corporation would be a material circumstance as bearing on Davenport's right to demand by way of a stockholder's suit an accounting from Stearns. But that sort of question is not involved here, because neither Davenport nor Laing is complainant. Incidentally I may observe, because the point was emphasized by the complainants, that even if there was a cause of action against Stearns because of the presence of Davenport and Laing as subscribers at the time of the Stearns-Plymouth contract, they could waive it or refuse to assert it, and it would not be permissible for other stockholders in whose favor no right to assert the corporate grievance otherwise existed to insist on the suit by virtue of Davenport's and Laing's rights in spite of their unwillingness or refusal to complain. I do not pause to give the reasons which in my judgment support this proposition, because, even if it be not accepted, it is of no importance for the reason that as I view the case no subsequent stockholders outside the group of Stearns' own associates for whom he was the spokesman and negotiator in the purchase, can call him to account on the theory that he was acquiring his rights not for himself and associates, but for a future corporation and stockholders yet to be brought in. Davenport and Laing were not of this group. Their subscription was obtained after the Stearns-Pickerell contract was entered into and its rights as well as obligations definitely and firmly fixed upon Stearns. They would be in no better position than the complainants. Another circumstance to which the complainants refer as showing that a fiduciary relationship to the future corporation existed at the time of the Stearns-Pickerell transaction, is that the time for "closing" the contract was fixed as sometime in November, a date which followed the formation of the Plymouth Oil Company and the paying in of money for its preferred stock by some at least of the complainants and interveners.

By this term "closing" is meant the actual physical deliveries provided for by the Stearns-Pickerell contract. Some such postponement of deliveries was provided for, not to enable a corporation to be organized and to raise funds from stock sales whereby to meet the obligation to Pickerell (Stearns and his associates were firmly and irrevocably bound to meet those obligations personally). The postponement was made necessary simply because of certain necessities connected with the clearance of titles. The deferring of the so-called "closing" date was a mere incident to the transaction between Stearns and Pickerell and throws no light whatever on the question of whether Stearns was then acting in substance as a trustee for a future corporation. Stearns was bound to eventually "close" the contract as agreed, regardless of whether a corporation was ever formed. The only other circumstance to which reference is made as indicating that Stearns in buying from Pickerell was buying in behalf of the subsequently formed corporation, is that all the cash which was eventually paid out on account of the Stearns obligation to Pickerell was derived either directly from the sales of preferred stock to the complainants and others, or indirectly by means of loans which such sales aided in negotiating. This is quite true. But while it is a circumstance of some probative value, yet in view of all the other facts it is far from possessing decisive significance. The important thing in this connection is that Stearns when he made his agreement with Pickerell was irrevocably committed to the cash obligations. He was personally bound and continued so to be to the end. Pickerell had Stearns' notes endorsed by certain of his associates and Stearns and his associates by lending the credit of their own endorsements enabled the company to raise the money necessary to carry out the obligations to Pickerell which the contract called for. When many of these endorsements were made, it is true that not much risk of loss to the endorsers was incurred. But there is the fact of their existence which cannot be overlooked. In eventually discharging Stearns' cash obligations to Pickerell the Plymouth Oil Company was simply in substance paying that part of Stearns' consideration for the properties. Stearns was never relieved from them by Pickerell.

In so far as I can recall, the foregoing are the only circumstances, in addition to the mere intent at the time of purchase to form a corporation to take over the rights, which the complainants have referred to as tending to disclose a fiduciary duty resting on Stearns in connection with his purchase from Pickerell. They. do not impress me as of determinative significance in that connection.

It is now in order to notice the contention which the complainants make with respect to the Pecos and Upton County properties. In addition to what has been before said in connection with the Pickerell property, it is urged that special circumstances surround the acquisition of these properties which are such as to show that Stearns must have been acting as the future corporation's fiduciary in their acquisition, and that certainly to the extent that he and his associates profited by the sale of these properties to the corporation an accounting must be made. The circumstance which is stressed in this connection is that at the time of the sale, Stearns did not own any rights whatever in Pecos and Upton Counties. While this is true, yet he must have been fairly certain that he would secure these properties before committing himself irrevocably to their sale and transfer. The fact is that in due time, not later than November 26, he made good his offer to transfer them in strict accordance with its terms. He and his associates paid for them. Now all that I can see in this circumstance is that Stearns made an absolute engagement to transfer properties which he then did not have and that he took the risk of being able to perform it. He did not offer to go out and get the properties if he could, on account of the company. He represented himself as the owner and promised to convey them. I am unable to gather from this circumstance that Stearns in acquiring these properties was acting as an agent for the corporation. Clearly, it seems to me, that his acquisition of them was strictly on his own account and to enable him to peform his own contract obligation. There is something in connection with the corporation's minute entries relating to the Pecos and Upton County acreage which called for explanation on the part of the officers of the corporation. But how the outcome of the present case is to be helped in any way by a detailed discussion and consideration of that question I am unable to see. Accordingly I pass it by.

There is one other thought in connection with the Pecos and Upton County properties which, it seems to me, is of importance. I refer to the fact that the evidence fails completely to show how much of the stock received by Stearns was given him for the Pecos and Upton County properties. This being so, it would manifestly be impossible to say what if any profit Stearns made by their purchase and sale. If, therefore, it be conceded as contended for by the complainants, that in the purchase of these properties Stearns was acting for the company, it would be impossible to say how much stock representing profit, if any, ought to be canceled. But as before indicated, I think the evidence does not justify the view that Stearns is to be regarded as having acted in a fiduciary capacity for the corporation when he acquired the Pecos and Upton County properties.

I have examined all the cases relied upon by the complainants as bearing on their proposition that Stearns, at the time of his purchase of the properties conveyed by him, was under a fiduciary duty to the subsequently organized defendant corporation. Those cases are hereinbefore cited. They all have clearly distinguishing circumstances of fact which in my judgment render them of no assistance in the instant case. A brief reference to them will now be made.

*Plaquemines Tropical Fruit Co. v. Buck, supra.* In this case the defendant, Buck, was a promoter who took a profit on a purchase by his company of lands in Louisiana. Buck was never the owner of the lands. One White was the owner and the company was in truth purchasing from him. Buck, the promoter, had the company pay more than White demanded or ever received. Buck himself distributed the consideration paid by the company, paying White, the vendor, what he was to get and retaining the balance for himself or disposing of it in his own interest. The promoter thus appears to have interposed his own hand between the corporation and its vendor to take a toll, so to speak, out of the consideration which he induced his company to pay.

*Woodbury Heights Land Co. v. Loudenslager, supra.* In this case the promoters had options pure and simple and were under no obligations to purchase. The corporation was formed and money paid in by subscribers to stock before the options were taken up.

The promoters had the directors resolve to purchase the lands under option for $80,000. The promoters then exercised the option, taking deeds which falsely recited total considerations of $80,000 when the true total was $66,223. The directors were ignorant of the true price. The court observed that the promoters "had neither paid nor given anything of value for it [the land], nor had they come under personal obligation with regard to it; nor did they intend to exercise their options until they had secured a purchaser." This circumstance that the promoters were not the owners of the land, was said by the court to be a distinguishing characteristic. Not only in this respect, but in others which I shall not pause to consider, but which a reading of the case will disclose, the case is clearly an entirely different one in important distinguishing fact aspects from the instant one.

*Arnold v. Searing, supra.* This was a case where promoters gave nothing whatever for the stock and bonds they received and which constituted a profit which they clandestinely took to themselves out of a transaction of purchase by a company of their own creation. They had organized a syndicate to finance the new corporation and its proposed purchase. The following extract from the opinion very readily shows the outstanding feature of the case which distinguishes it in principle from the instant one:

"In the second place, the real parties in interest, as opposed to the interests of the promoters, were the syndicate shareholders who had furnished or had agreed to furnish the actual cash with which the promoters' operation was carried on; they were not notified in any manner of the amount that the promoters were expecting to make. They severally became equitable stockholders in the new corporation, as soon as they had subscribed to the syndicate shares, and it had been determined that the operation would be carried on; they were, with the promoters, the equitable owners of the stock, and as such were entitled to be informed by the promoters of all details of the operation and of the amount of profit which they were making."

If, in the instant case, Stearns had in some way taken a secret advantage of his associates and had cheated them out of their legitimate share in the common asset which he was acquiring in behalf of all, *Arnold v. Searing* would then be an authority in point. But such, of course, is not the situation we are here dealing with.

*Burbank v. Dennis, supra.* This case is similar in principle to that of *Arnold v. Searing*, with the added circumstance that the

promoters facilitated the accomplishment of their fraud upon their associates in the joint venture by expressly agreeing to turn the purchased lands over to the corporation at cost and by a false representation to their associates that the cost was $96,000 more than it in truth was.

*South Joplin Land Co. v. Case, supra,* falls within the same class of cases as do *Arnold v. Searing* and *Burbank v. Dennis.* The promoter in the *South Joplin Land Co. Case* had an option to purchase lands together with certain notes. He falsely represented to subscribers to stock, equitable stockholders, and to the corporation after it was formed, that the owner of the property required to be paid a consideration of $32,000. This was false. Only $30,000 was required. The corporation, however, paid $32,000 to the owner who gave $2,000 of it to the promoter. The promoter also represented to the corporation that the owner had withdrawn the notes from his offer of sale. This too was false. The sale went forward, however, at the original figure of $32,000 in cash, $2,000 of which, as stated, the vendor gave to the promoter, and the notes were also transferred by the vendor to the promoter. The promoter was required to account for the $2,000 in cash and the notes which he received at the expense of the corporation from its vendor.

*Yeiser v. U. S. Board & Paper Co., supra,* was a case where two promoters had agreed to buy property at a price of $75,000 payable $40,000 in cash and $35,000 in bonds, upon the express condition that a newly organized corporation should purchase the property from the promoters on or before January 1 following. This fact alone, without mentioning others appearing in the case, is enough to distinguish it from the one we have in hand, for clearly the promoters were agreeing to buy in behalf of a corporation. Their agreement with the vendor admits of no other interpretation. They themselves were never under any obligations to purchase the property and never acquired title to it until after the corporation was formed, its stockholders had paid in their money and its board of directors committed, through the control of the promoters, to the purchase.

*Yale Gas Stove Co. v. Wilcox, supra.* Facts of an entirely different nature from such as we find in the instant case appear in the cited one, which present such a strong showing of agency that

the court was persuaded that Wilcox as promoter was acting for a company he proposed to form. His covenants with the owner of the patents were on behalf of himself "together with his associates" who were induced by him to become stockholders in the proposed purchasing company. In substance, these were equitable stockholders. And, too, in the contract between the owner on the one side and Wilcox and his associates on the other, Wilcox himself was to pay nothing to the owner. He agreed "to cause to be paid * * * upon the organization of said company" $3,000 in cash and $5,000 in stock, a consideration which was twice what the owner was willing to sell for. This of course meant that he was to make the proposed company pay these amounts. Wilcox, says the court, never contemplated an acquisition of any interest in the patents for himself. The corporation was to acquire the patents and did, and Wilcox took a secret profit, securing from the seller a portion of the consideration paid by the company. He concealed this from the subscribers, who as contemplated by him were his associates to buy the patents and he induced these associates to become subscribers by representing to them that he was putting in his own money "upon precisely the same basis" as they were.

The foregoing being the character of cases cited by the complainants in support of their theory that in this case Stearns was acting as agent for the proposed corporation when he acquired the properties which he later sold to it, it seems to me to be apparent that they are so dissimilar in their facts as to render their legal principles irrelevant to the controversy we are concerned with. In his sale to the corporation Stearns acted as an owner-vendor. He was not an optionee with respect to the property. With respect to the Pickerell rights he was the undoubted owner and with respect to the Upton County and Pecos County properties he assumed to be such owner and definitely committed himself on that basis; he took no advantage of his associates, and all who were joined with him in the purchase and sale were fully cognizant of and agreed to what he did. Whether the corporation was ever formed, or not, he was bound to make good his agreement with Pickerell and to pay the money and do the work which that agreement called for. The assumption by the purchasing corporation did not relieve him of these obligations. He continued to be liable for their faithful per-

formance. Certainly, if upon the formation of the corporation and the sale of its stock, Stearns had changed his mind and concluded not to sell it, there is nothing in the circumstances attending his dealings anterior to his offer, which would in anywise warrant a contention on the part of stock subscribers (outside of course of Stearns' associates) that he was bound to turn the property over to a corporation of which they were members. So complete and unfettered by all equities were he and his associates that they were at liberty to do as they pleased with the property. They could have held it as individuals, or sold it to a corporation either of their own creation or already existing. I cannot escape the conclusion that Stearns in his acquisitions was under no fiduciary duty to anyone outside the circle of the associates for whom he was then acting. The complainants not being in that group, they are not entitled to say that when Stearns acquired the properties he was acting in their interest as stockholders of the subsequenlty formed and purchasing company. Whatever duty Stearns was under to the purchasing corporation arose at a later time, if at all. 'And the only duty that can be said to have attached itself to him under the facts is, that when he came to the act of making a sale to the corporation he should demand and receive not more than what in the judgment of a disinterested board of directors was a fair price, or if such disinterested judgment was not to be had, as it was not, what in the judgment of the court reviewing the transaction would be regarded as a fair price.

This brings me to consider, therefore, the question of whether the sale made by Stearns was a just and fair one. In answering this question, I shall, as before stated, not pause to consider whether the complainants who were not stockholders at the time are in a position to raise it. Whether the circumstance that all the then existing stockholders were fully advised of the entire transaction and its detailed history from the beginning, would in law preclude the corporation at the instance of subsequent uninformed stockholders from complaining about the matter of price, it is unnecessary for me to decide; because I shall, as indicated at the outset, assume for the purposes of this case that the complainants who are such subsequent uninformed stockholders are not precluded from complaining in behalf of the corporation.

The question, therefore, is whether Stearns gave to the corporation full and fair value for the stock he received. I was of the opinion on the showing made by the affidavits at the earlier stage of this case that he had not only given full value for the stock but very much more. The evidence adduced on final hearing has not changed that opinion. On final hearing the evidence upon this point on the side of the defendants is practically the same as it was at the preliminary hearing, and the evidence adduced by the complainants has not overcome it. I accordingly find now, as I did then, that the Pickerell rights alone, leaving out of account entirely the Pecos County and Upton County properties, were fairly and justly worth several times the five and a quarter-millions of stock that Stearns and his group received in exchange. This being so, no profit was made by the promoters at the expense of the corporation, and there is therefore no justification for a cancellation of the stock which they received. The opinion filed at the preliminary injunction stage so fully discusses this aspect of the case, that I content myself at this time by a mere reference to what was then said upon it.

Before concluding this discussion, I am prompted by some comments made by the learned solicitors for the complainants touching a portion of the opinion heretofore filed, to indulge in a word of explanation of that portion of the opinion which, by reason doubtless of my obscurity of expression, they have misunderstood. I refer to the place in the opinion where I was noticing the point made in argument that the complainants as purchasers of preferred stock which had been issued and turned back into the treasury for sale, were estopped from complaining because the knowledge which their predecessors in title had would be attributed to them. I distinguished certain cases cited by the complainants in connection with this point as not applicable because they were cases of over-valuation. The error, say the solicitors for the complainant, in making this a ground of distinction for those cases is that it makes the supposed estoppel to rest on the nonessential of valuation and not on consent with knowledge of the facts. I certainly did not mean to be understood in the way my language has led the solicitors for the complainants to believe. All I saw in the case then, as all I see now, was and is that the only

duty resting upon the promoters was under the facts of this case to sell at a fair value. If fair value was received, there was no recoverable profit. Therefore, the treasury stock which in this case was issued for fair value and then went to subsequent purchasers, was good stock unladen with any feature or circumstance which made the question of profit or wrongs of any kind at all pertinent. Estoppel presupposes a wrong. If there is no wrong, there is no occasion to consider estoppel. But if the stock had been issued for over-valued property, then the question of estoppel and its applicability would have been a pertinent one. In this case, there having been no over-valuation, I therefore entertained the view that the over-valuation cases were of no help and should be laid aside. I did not mean to indicate, as the learned solicitors seem to think, that if there was a wrong arising out of the act of the purchase, the question of estoppel against asserting such wrong would be bound up with any question of over-valuation.

A decree will be entered dismissing the bill with costs on the complainants.

NOTE.—The Chancellor's decree was affirmed on appeal, and the opinion of the Supreme Court will appear in 16 *Del. Ch.* See also 141 A. 197.