### TILDEN et al. v. BARBER et al.

(District Court, D. New Jersey. October 8, 1920.)

1. **Courts ⬅➡375—State statute of limitations not binding on federal court of equity.**

   Act N. J. April 8, 1903 (P. L. 1903, p. 362), supplementing the Corporation Law, and providing, inter alia, that promoters who make a secret profit or bonus shall be liable to the corporation therefor in an action either at law or in equity brought within four years but not afterwards, imposed a condition upon the right to sue at law, but as to suits in equity, which could be brought independently of the statute, merely prescribed a limitation binding upon the courts of the state, but not upon the federal courts.

2. **Equity ⬅➡70—Time for bringing suit for fraud runs from discovery.**

   Where the fraud by which promoters of a corporation secured an unlawful bonus was concealed, a federal court of equity will not deem a right of action for its recovery to have accrued until the fraud is discovered, or should have been discovered.

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Corporations ⬳30(3)—Promoter liable for secret profit.**

Defendant obtained options on a number of cereal plants to be taken over by a corporation in which the sellers were to become stockholders. He also advertised for and obtained subscriptions to the stock from outsiders, and then organized the corporation, with dummy directors, who accepted his offer to sell the plants to the company at the price named by him in stock and bonds of the company, and issued all its stock to him as its agent. He settled with the sellers separately, having each property conveyed directly to the corporation for the expressed consideration of $1, concealing from each seller the price paid to the others, and also concealed the amount paid from knowledge of the corporation after it was taken over by the stockholders for ten years, when it was discovered that he had made a profit on the transaction of over $1,000,000. *Held*, that he was not the owner of the properties, dealing with the corporation at arm's length, but occupied a fiduciary relation to it and at least to the outside subscribers to its stock, and was accountable to its receivers for such profit.

**4. Corporations ⬳30(2)—Promoter bound to select competent and honest directors.**

Promoters of a corporation are bound to the exercise of good faith toward all the stockholders, to disclose all the facts relating to the property and to select competent persons as directors, who will act honestly in the interest of the stockholders.

**5. Corporations ⬳30(3)—Undisclosed profits of promoter.**

A prospectus and subscription agreements, put out by the promoter of a corporation, setting forth that the stock was to be issued for the acquisition of certain plants and good will, to provide a working capital, and pay the necessary expenses of organization, *held* not to disclose to subscribers that the property was to be acquired through the promoter, at a large advance over the price paid to the sellers, or that their stock was not to be issued to them direct by the corporation, but was to come from that issued to the promoter in payment for the property.

**6. Principal and agent ⬳180—Notice to agent is not notice to principal, where agent adversely interested.**

That a trust company, which acted as fiscal agent for the promoter of a corporation and was afterward made registrar of the corporation by him, had knowledge of the profit made by him from the promotion, *held* not to charge the corporation with such knowledge, especially where the trust company refused to disclose information on the subject to an officer of the corporation.

**7. Corporations ⬳426(2)—Void act by officers cannot be ratified.**

An injurious act done by the officers or directors of a corporation, which is not merely voidable, but void, cannot be ratified or condoned by the stockholders.

**8. Corporations ⬳30(3)—Cannot validate by ratification ultra vires act of directors in issuing stock to promoter for property.**

Under the New Jersey Corporation Act, providing that nothing but money shall be considered as payment for the capital stock of a corporation, except that it may purchase property necessary for its business and issue stock to the amount of its value in payment, and that in the absence of actual fraud the judgment of the directors as to such value shall be conclusive, as construed by the highest court of the state, holding that conscious and intentional overvaluation of the property is actual fraud, the issuance to the promoter of a corporation by his dummy directors of stock in payment for property in an amount largely in excess of the price paid by him to the owners for the property *held* ultra vires, and not subject to ratification by the corporation, either expressly or by acquiescence.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. **Corporations** ⊛⊐560(7)—**Suit by receivers against promoter not barred by laches.**

Suit by receivers of a corporation, brought 12 years after its organization, to recover profits fraudulently made by its promoter, *held* not barred by laches, where defendant and his associates in the promotion dominated the corporation during the most of that time and successfully concealed knowledge of his profits from the other officers and directors, and where he is not shown to have been prejudiced by the delay.

10. **Corporations** ⊛⊐30(3)—**Remedy against promoter for making illegal profit.**

The remedy against a promoter of a corporation for securing a profit by fraudulently selling property to the corporation at a large overvaluation is not limited to a recovery or cancellation of the stock issued to him for the excess in valuation, and where the corporation has become insolvent, and its stock is of no value, its receivers may recover the amount of such profit for the benefit of its creditors.

In Equity. Suit by William A. Tilden and Charles D. Thompson, receivers of the Great Western Cereal Company, against Ohio C. Barber and others. Decree for complainants.

Hartshorne, Insley & Vreeland, of Jersey City, N. J., and Adams, Childs, Bobb & Westcott, of Chicago, Ill. (Wm. E. Decker, of Jersey City, N. J., and Elmer H. Adams, of Chicago, Ill., of counsel), for plaintiffs.

Sims, Welch & Godman, of Chicago, Ill. (Gilbert Collins, of Jersey City, N. J., and Albert G. Welch, of Chicago, Ill., of counsel), for defendant Ohio C. Barber.

RELLSTAB, District Judge. This is a suit in equity, brought by the receivers of the Great Western Cereal Company, a corporation of New Jersey, decreed insolvent by the Court of Chancery of that state, against Ohio C. Barber and others, to recover undisclosed profits made by them in the promotion and organization of that company. Barber alone was served with process. The suit was originally brought in the Court of Chancery of New Jersey (bill filed November 17, 1913), and removed by Barber into this court on the grounds of diversity of citizenship and separable controversy between him and the plaintiffs. Since the argument Barber has deceased, the suit has been revived, and his personal representatives have been substituted in his stead as defendants.

Briefly stated, the bill alleged that Barber and his associates planned and consummated the organization of the Great Western Cereal Company (hereinafter called the company) and the acquisition by it of 10 certain oatmeal mills for the purpose of gaining secret profits; that he secured such profits by taking from the company, at a time when all its directors and officers were his agents, its stock and bonds as consideration for the conveyance to it of such mills, far in excess of the value of such properties; and that he so manipulated such transaction that the overvaluation was hid from the company until shortly before the filing of the bill.

The New Jersey Corporation Act (Rev. 1896; P. L. 1896, p. 277) prescribes that—

---

⊛⊐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"Nothing but money shall be considered as payment of any part of the capital stock, * * * except as hereinafter provided. * * *" Section 48.

The proviso is that—

"Any corporation * * * may purchase * * * manufactories or other property necessary for its business, * * * and issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be full-paid stock and not liable to any further call, neither shall the holder thereof be liable for any further payment under any of the provisions of this act; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased shall be conclusive. * * *" Section 49.

The New Jersey cases construing these sections all hold:

"That the stock must be paid for in money or money's worth, and that any conscious or intentional overvaluation is actual fraud, within the meaning of the sections quoted." Tooker v. Sugar Refining Co., 80 N. J. Eq. 305, 315, 84 Atl. 10, 15, and cases cited.

The pleaded defenses, generally stated, are that Barber but exchanged his own property for the stock and bonds of the company; that this exchange was approved by all the persons who held the company's stock at the time of such exchange; that he sustained no fiduciary relations to the purchasers of the company's stock and bonds; that the plaintiffs and the company are guilty of laches; and that the New Jersey statute, approved April 8, 1903 (P. L. N. J. p. 362), is a complete bar to the suit.

[1] As this New Jersey statute is said to protect Barber from a suit of this character, regardless of the merits of the plaintiff's allegations of fact, that defense will be considered first. This act is a supplement to the New Jersey Corporation Act, approved April 8, 1903 (P. L. N. J. 1903, p. 362). It provides:

"1. Any director, officer, promoter or other agent of any corporation organized or existing under the laws of this state who shall have heretofore made or received, or who shall hereafter make or receive, while acting in such capacity, any bonus, profit or reward of any kind whatsoever out or on account of any transaction for or with such corporation, without disclosure of the fact of such bonus, profit or reward to the corporation and without obtaining its approval thereof, shall be liable to such corporation for the amount or value of such bonus, profit or reward for and during the period of four years from and after the making or receipt of the same and not afterwards; and an action shall lie on behalf of such corporation, either at law or in equity, to recover such bonus, profit or reward, or the value thereof, or for an account with respect thereto, at any time before the expiration of said period of four years, but not afterwards.

"2. This act shall take effect immediately, but shall not affect any action or proceeding pending in any court at the time it takes effect, or any right of any corporation, or of any stockholder, against any such director, officer, promoter, or other agent, under existing law, provided action thereon be commenced within six months after this act takes effect."

This act was repealed in 1907 (P. L. N. J. 1907, p. 631), but as it is claimed that while it was in force Barber obtained certain vested rights which, under the Constitutions of New Jersey and the United States, were preserved to him, notwithstanding such repeal, its

provisions as affecting the jurisdiction of the federal court will be considered.

As noted, it dealt with profits made by promoters of a New Jersey corporation, without disclosure to it, and without obtaining its approval thereof. It declared the promoter liable to the corporation for such profits during, but not after, four years from the making or receipt of such profits. It authorized the recovery thereof, either at law or in equity, at any time before, but not after, the expiration of said period. Before the passage of this act, only an action in equity could be brought for a return of such profits. The act created the right to sue at law, but was only declaratory of such a right in equity. As to the action at law, the four-year period within which such suit could be brought was probably a condition annexed to the right, and not a limitation affecting merely the remedy. Partee v. St. Louis & S. F. R. Co. (C. C. A. 8), 204 Fed. 970, 972, 123 C. C. A. 292, 51 L. R. A. (N. S.) 721. Not so, however, as to suits in equity. As to these, such period affected only the remedy, and in essence was a statute of limitation.

Whatever effect the repeal of this statute had upon the legal remedy, the equitable remedy still remained, and the time within which such remedy is enforceable is controlled by equitable principles alone. Do these require that a suit brought after the statute was repealed, but founded upon a fraudulent transaction covered by the statute when in force, be dismissed because more than four years elapses after the fraud was committed, regardless of when the fraud is actually discovered, or whether the suit is brought in a state or United States court?

[2] Under general equity principles, not the time when the fraud is committed, but when it is discovered, or might have been discovered by the exercise of ordinary diligence, fixes the time when the cause of action accrues. Construed literally, the New Jersey act fixed the time when the profit was made or received, and not the discovery of the taking of it, as the beginning of the four-year period within which suit might be brought. Whatever might have been the effect of this legislation upon the powers of the New Jersey courts, it did not impair the jurisdiction of the United States courts in enforcing distinctively equitable rights. Kirby v. Lake Shore & Michigan Southern R. R., 120 U. S. 130, 7 Sup. Ct. 430, 30 L. Ed. 569; Taylor v. Louisville & N. R. Co. (C. C. A. 6) 88 Fed. 350, 357, 31 C. C. A. 537; James v. Gray (C. C. A. 1) 131 Fed. 401, 408, 65 C. C. A. 385, 1 L. R. A. (N. S.) 321; Stevens v. Grand Central Min. Co. (C. C. A. 8) 133 Fed. 28, 32, 67 C. C. A. 284; Humphreys v. Walsh (C. C. A. 3) 248 Fed. 414, 160 C. C. A. 424; Independent Harvester Co. v. Tinsman (C. C. A. 7) 253 Fed. 935, 166 C. C. A. 35.

In the Kirby Case the United States District Court held, upon what it supposed had been determined by a state court as the proper interpretation of a state statute, that the cause of action accrued on the commission, and not the discovery, of the fraud. The Supreme Court, after expressing doubt as to whether the cited state

authorities justified such a conclusion, said that, be that as it may, a local statute could not "impair the power of the courts of the United States to enforce the settled principles of equity in suits of which they have, by the Constitution and laws of the United States, full jurisdiction" (120 U. S. 137, 7 Sup. Ct. 434, 30 L. Ed. 569), and that it was the duty of the United States courts to follow the settled rules of equity, and "adjudge that time did not run in favor of defendants, charged with actual concealed fraud, until after such fraud was or should, with due diligence, have been discovered. Upon any other theory the equity jurisdiction of the courts of the United States could not be exercised according to rules and principles applicable alike in every state." 120 U. S. 138, 7 Sup. Ct. 434, 30 L. Ed. 569. This being the rule controlling the federal courts in suits of this character, the disputed contentions regarding the effect of the repeal of this statute are purely academic and need not be considered.

[3] Whether there was laches in bringing this suit, and, if so, whether it is imputable to the receivers, may best be discussed after the merits of the plaintiffs' allegations of fact have been considered, to which I now turn. In his answer (paragraph IV) to the plaintiff's allegation that he, jointly with Frank M. Atterholt (then deceased), Arthur D. Bevan, Joy Morton, and Frank P. Sawyer (all of whom, except Atterholt, were made defendants), promoted the company and had it acquire the plants referred to, that they might make secret profits, Barber asserted that at the request of Atterholt and Morton he "devoted his efforts, influence, and credit" to their plan for the promotion of the company and to acquire such properties, but he denied that it was with any purpose of acquiring for the defendants any secret profits, or any profit for himself, "other than a reasonable return for the efforts, influence, capital, and credit" which he "should and did devote to such enterprise."

No testimony was offered by or on behalf of Barber, and at the argument on final hearing his counsel admitted that he promoted this company. Barber's failure to introduce evidence to support his pleaded affirmative fact defenses, or to contradict or explain any of the evidence introduced by the plaintiffs, reduces the judicial inquiry, so far as the facts are concerned, simply to whether such evidence sustains the allegations of their bill. This amply sustains the following findings:

Early in 1901 (the year to which all the dates hereinafter mentioned refer, unless otherwise stated), after some previous futile attempts by the owners of a number of oatmeal mills to agree upon some satisfactory basis to relieve the strain of the severe competition in their line of business, Atterholt and Barber began to negotiate with some of these owners for options to purchase their respective plants. As a result Barber secured written options in his own name for the purchase of 10 several mills, bearing date April 1st. In these the owners of the mills (hereinafter called millers) were named "vendors" and Barber the "purchaser." They each recited the intention of the purchaser to organize a corporation

under the name of the Great Western Cereal Company, to purchase a number of plants engaged in the manufacture of flour and cereals, and the vendors' desire and agreement to sell to the purchaser, or his nominee, provided he gave notice on or before April 15th, that he would avail himself of the option. In negotiating for these options Barber dealt with the millers separately, declining to divulge to any what was to be paid to another, and at the time they were given no miller knew the price which any other miller was to receive for his plant. Before and after the date of these options, Barber and the millers held a number of joint conferences, at which the formation and operation of a proposed company were discussed. At one of these meetings before such date the prospectus or announcement of the organization of such a company, and the subscription agreement for the purchase of its capital stock, were furnished by O. C. Barber and his associates, and agreed upon. After some discussion at the meeting of March 28th, at which Barber was present, it was unanimously resolved:

"That it be the sense of the millers present, representing their several properties, that they combine them into one company, to be known as the Great Western Cereal Company, as outlined by a certain prospectus and subscription agreement heretofore furnished by O. C. Barber and associates.

"That said Barber be hereby authorized and instructed to at once take out a charter under the laws of New Jersey, as set forth in said prospectus.•

"That, when subscriptions are made under said subscription agreement, to comply with its terms, then inventories of the several plants be taken, and that the several properties be taken over by the new company not later than April 15, 1901.

"In order to establish the value of said vendors' stock and best protect the interests of all concerned, the stock be pooled for sale, or issued only on promise of recipient that it shall not be offered for sale at less than par for a period of 12 months."

The prospectus (undated) was headed:

"Announcement

"of

"The Great Western Cereal Company

"of

"New Jersey.

"Authorized Capitalization:

6 per cent. 20-year sinking fund gold bonds....................$1,500,000.00
Capital stock ........................................ 3,000,000.00

"Shares, $100.00 Each."

Among other things it declared that—

"After acquiring the properties and good will, and paying the necessary expenses incident to the organization of the company, there will be left in the treasury $1,250,000.00 for working capital.

"The Great Western Cereal Company is a corporation about to be organized under the laws of the state of New Jersey, for the purpose of manufacturing and dealing in oatmeal and cereal products.

"Contracts have been closed for the purchase of the plants, good will and business, valuable trade marks, names, copyrights, patents, and patent processes of the following cereal companies."

It also gave the names of the 10 companies upon whose plants Barber then held options, the names of 13 persons who were to be on the board of directors of the new company, including the defendants Barber, Morton, and Sawyer, and 9 other persons, who with Sawyer were then identified with plants to be acquired, the names of the persons who were to be its officers (being some of the directors), and concluded with the statement that Barber was to be the chairman of the board of directors, and that the American Trust & Savings Bank of Chicago was to be the registrar of the company. This prospectus contained other provisions which are not necessary to be reproduced here. The subscription agreement is as follows:

"The Great Western Cereal Company
"Subscription Agreement.
"Authorized Capital:

| | |
|---|---|
| 6% 20-year sinking fund gold bonds | $1,500,000.00 |
| Capital stock | 3,000,000.00 |

"To be issued as set forth in prospectus of even date herewith for acquisition of plants and a working capital of $1,250,000.00.

"Now Offered For Sale:

| | |
|---|---|
| Bonds | $1,000,000.00 |
| Stock | 1,000,000.00 |

accompanied by

| | |
|---|---|
| Stock bonus | 200,000.00 |

"Subscription to bonds and stock must be in equal amounts. No subscriptions for less than $500.00 of each will be accepted.

"We, whose names are hereunto subscribed, agree severally, but not jointly, with Ohio C. Barber, and with such other persons as he may elect to associate with him and with each other, to pay the amount of cash set opposite our respective signatures, as follows: 25% shall be payable into the American Trust & Savings Bank, Chicago, on allotment, to the order of Ohio C. Barber, as soon as subscriptions aggregating $1,000,000.00 have been secured hereunder, and under like papers.

"The remainder shall be paid to said American Trust & Savings Bank, likewise to the order of said Ohio C. Barber, in three equal monthly payments.

"The right is reserved to allot less than the amount applied for hereunder.

"Each subscription hereto for $5,000.00 of the bonds and $5,000.00 of the stock shall entitle the subscriber to an additional $1,000.00 par value of the stock.

"Subscriptions for larger or smaller amounts shall participate in the like proportion.

"This agreement may be signed in separate writings with the same effect as if all signatures were made upon one paper, and shall bind the parties hereto of the first part, their successors, personal representatives and assigns."

On April 8th the company was incorporated. The authorized capital was $100,000, divided into shares of $100 each, and the amount with which it was to begin business was $1,000. On April 10th the company was organized by five stockholders, each of whom held 2 shares of stock, paid for by Barber. These, representing Barber, elected themselves directors, and from among themselves selected the first officers of the company. To these—his own nom-

inees (hereinafter called dummies)—he made the following proposition:

"April 15, 1901.

"The Great Western Cereal Company, 15 Exchange Place, Jersey City, N. J.—Gentlemen: I control property and rights more particularly described below, and am of the opinion that same would be of great value to your company, and I therefore take pleasure in making you the following proposition:

"In consideration of the sum of $2,499,000 in the capital stock of the Great Western Cereal Company, said stock to be full-paid and nonassessable, and $1,000,000 in the 6 per cent. 20-year sinking fund gold bonds, of your company, said bonds to be secured by mortgage deed on the properties herein proposed to be transferred to your company and to draw interest at 6 per cent., payable semiannually in gold, and provision to be made for a sinking fund of 5 per cent. per annum of the par value of the bonds issued, and such bonds to be subject to redemption on and after March 1, 1903, at one hundred and five per cent. (105%) of their par value and accrued interest. I will sell, assign, transfer, set over, and deliver, or cause to be sold, assigned, transferred set over and delivered, to your company or your assigns by good and sufficient deeds of conveyance, the properties, good will, valuable trademarks, and business of the following companies:

The Akron Cereal Company...................................Akron, Ohio
Muscatine Oatmeal Company.................. ...... ... ..Muscatine, Iowa
H. R. Heath & Sons...............................Fort Dodge, Iowa
Nebraska City Cereal Mills........................Nebraska City, Neb.
Stewart & Merriam........................... .......Peoria, Ill.
Sioux Milling Company ..........................Sioux City, Iowa
David Oliver ....................................Joliet, Ill.
Pillsbury-Washburn oatmeal business (except real
  estate) .........................................Minneapolis, Minn.
Northwestern Cereal Company....................Minneapolis, Minn.
Cedar Falls Mill Company........................Cedar Falls, Iowa

and pay or cause to be paid into the treasury of your company the sum of $249,000 in cash as a working capital.

"The above-mentioned stock and bonds to be issued to myself or my nominees as I shall in writing direct, and to be delivered by you to the American Trust & Savings Bank of Chicago, to be by them delivered to me or my nominees upon receipt by them for your company of proper and sufficient deeds of conveyance of the above-described properties.

"Trusting you will give the above proposition your favorable consideration, and awaiting your reply, I am,

"Respectfully,                              Ohio C. Barber."

On April 22d Barber's proposition was accepted by the company thus controlled by him, and on his orders all the company's stock, other than the 10 shares issued to the five persons before mentioned, was directed to be issued to him as agent. Subsequently, viz. April 29th, the membership of the board of directors was increased, and on the same date all but one of these "dummy" directors were superseded by stockholders who had become such after Barber's proposition had been thus accepted. Barber was elected one of the enlarged board of directors and the chairman thereof, a position which he held until June 21, 1906.

On May 2d and 3d the 10 plants were deeded to the company for the recited consideration of $1 each. When the deeds were delivered, the millers were separately called before Barber, Atterholt (his attorney), and a Mr. Jones, representing the American Trust

& Savings Bank, in one of such bank's offices, and there they were each given the amount of stock, bonds, and cash called for in their respective options. Receipts, called "O. K. statements," from their being so initialed by the millers and Barber, were taken from these millers. By this method of dealing with the millers separately, each miller was kept in ignorance of the exact consideration which the other millers received for their plants, and it was not until the year 1910 that any of them learned what the others had received. The bonds and stock thus delivered to these millers were part of those ordered issued to Barber. Before the company was incorporated, Barber began to actively solicit "outsiders" to subscribe for the stock and bonds of the proposed company, using the prospectus and subscription agreement referred to for such purpose. This solicitation began as early as February 19th. Of the persons thus solicited a considerable number promptly subscribed. At the meeting of March 28th, at which, as noted, it was resolved to incorporate the company, Barber reported that he had received about $175,000 of subscriptions from such outsiders and about $400,000 from his friends. On April 11th Barber sent out a circular letter to the subscribers, notifying them that subscriptions aggregating $1,000,000 of bonds and stock of the company had been received; that the first installment of their subscriptions was then due and payable, and to make their checks payable to the order of the American Trust & Savings Bank. In a letter to the millers (undated), but from the reference of dates mentioned therein evidently sent about this time, Barber notified them that it was expected that "the payments on the stock subscriptions [would] be in hand, so that a full meeting may be had on Wednesday, April 24th." It is testified that this letter was formulated at a meeting of the board of directors of the company, over which Barber presided.

On April 29th, David Oliver, an owner of one of the plants purchased by the company, became secretary of the company, and continued in that office until June 14, 1907. Shortly after the company acquired these plants, upon inquiring of Barber what amounts he should enter upon the company's books as the value of each of the several plants, he was told by him that such a "division was not necessary." Frank P. Sawyer, one of the owners of a plant sold to the company, was president of the company from April 29, 1901, until June 8, 1904, and from June, 1911, until the appointment of the receivers; Joy Morton was the president from June 8, 1904, until June, 1911. Not long after the organization of the company, Sawyer went to the American Trust & Savings Bank to obtain a list of the holders of the company's bonds, and was refused such information, on the ground that it was confidential. In 1910 Sawyer agian sought the bank for the same information, and in looking over a bundle of papers which it gave him at that time he noticed several of the O. K. statements hereinbefore referred to. He made no examination of them at that time, but in 1911, after he had been again elected to the presidency of the company, he did examine them. By totaling the figures therein contained he ascertained what had

been paid the millers for their plants 10 years before, and, by comparison with the amount that Barber had received from the company at the time of its organization, that Barber had made a profit of over $1,000,000.

Shortly thereafter he disclosed this information to Joy Morton and his attorney, Stern. Later, in a circular letter, dated October 14, 1911, issued to the company's stockholders over his name as president, advising them of the company's condition—financial and otherwise—there appeared the following statement:

"A few months ago the management obtained the original contracts showing the figures at which the different plants were taken over by the company."

Then followed detailed figures showing the amounts of cash, bonds, and stock received by the millers for the plants they had conveyed to the company in 1901. On May 13, 1912, pursuant to a bill filed for that purpose, the company was declared insolvent and receivers were appointed for it by the New Jersey Court of Chancery. Subsequently that court gave leave to the receivers to file a bill against Barber and the other defendants named herein, and on November 17, 1913, as hereinbefore noted, the present bill was filed.

Barber's dealing with the millers in the negotiations preliminary to securing the options, viz. cautioning them not to disclose to each other what they respectively were to receive for their plants, and his dealing with them separately when they were paid for their properties, evidence a purpose to prevent their knowing how much profit he contemplated making in that undertaking. His refusal shortly after the organization of the company to divulge to Oliver, the secretary of the company, how much had been paid for each plant, though requested by him to furnish such information for bookkeeping purposes, evidences a purpose also to withhold such knowledge from the company's officers and stockholders. All this tends to establish, and in the absence of contradiction or explanation does establish, that Barber was seeking to secure a profit in the formation of this company and in its purchasing of these plants, which he was unwilling to disclose to the millers whose plants were to be purchased, the company whose securities were taken by him as consideration for such properties, or the outsiders who purchased the company's bonds and stock at his solicitation.

Without seriously disputing that such was the purpose of Barber, it is contended on his behalf, and alleged to be a complete defense, that Barber was the owner of the properties—options—at the time he sold them to the company, and that his taking over the bonds and stock of the company in lieu thereof was but the exchanging of one class of property for another, that in such a situation he was under no obligation to disclose what profits he was making, and that under the case of Old Dominion Mining & Smelting Co. v. Lewisohn, 210 U. S. 206, 28 Sup. Ct. 634, 52 L. Ed. 1025, he was not accountable to the company for any profit that he may have made in such transaction.

In Yeiser v. United States Board & Paper Co. (C. C. A. 6), 107 Fed. 340, on page 344, 46 C. C. A. 567, on page 571 (52 L. R. A. 724), it was said (Severens, Circuit Judge, writing the opinion):

"It is a well-settled principle of equity that those who participate in bringing about the organization of an incorporated company, and in getting it in condition for transacting the business for which it is organized, assume the obligations of a trust towards the company and those who shall be invited to come into the enterprise as stockholders and share in its fortunes. The latter have the right to rely on the good faith and fair dealing of those who have promoted the company, and to assume that they have not perverted the organization by secret means to the accomplishment of selfish purposes, and the destruction of that equality of right which, in the absence of some known modification, all the shareholders are entitled to enjoy. * * * The recognition of a fiduciary relation in such circumstances is merely for the application of a familiar principle of equity, which fastens a trust upon one who has such power over another and his affairs as to give the former an opportunity to make personal gains in his dealings with them. The reasons for the enforcement of that principle in such cases as this are obvious. Without it there is nothing to hinder the concoction of schemes which the reports of decisions show are becoming quite too frequent in recent years, during which corporations have so greatly multiplied, whereby one may take an option or conditional contract for the purchase of property, and then turn it over, at a profit to himself, to a corporation to be organized, and be under his own control for a sufficient time to enable him to realize the fruits of his enterprise. Unless the promoter of the company is restrained by the obligations of a duty which prevents him from bringing the consequences which are liable to result to others who may be led into danger, he may practice such schemes with impunity."

There is much more in this helpful opinion, the excellency of which was recognized in Davis v. Las Ovas, 227 U. S. 80, 33 Sup. Ct. 197, 57 L. Ed. 426, that might be quoted, but this is deemed sufficient for present purposes. That this case states the general doctrine applicable to promoters of corporations is not disputed, but it is contended that when it is read in the light of Old Dominion Copper Co. v. Lewisohn, supra, it will be found inapplicable to the instant case. In the Lewisohn Case the Supreme Court announced a doctrine differing in some respects from that prevailing generally in the state courts. See Old Dominion Copper Mining & Smelting Co. v. Bigelow, 203 Mass. 159, 89 N. E. 193, 40 L. R. A. (N. S.) 314, and cases cited. In substance, the Lewsiohn Case holds that, where the owners of a property sell it to a corporation at a time when they are the only stockholders, they are under no legal obligation to disclose their profits, though at the time of sale a further large issue of the company's stock to the public was contemplated, and thereafter actually issued, and that a subordinate fraud practiced by such owners upon some of their associates in the promotion syndicate was immaterial to the corporation and gave it no right of action against such vendors. This case was decided on demurrer, and while the report of the case does not fully disclose the allegations of the bill in regard to the time when the subscriptions to the additional stock were solicited, it was stated that such stocks were not offered to the public until after the sales in question had been consummated. The absence of "any innocent interest" at the time the sale was made seemingly was the deciding factor in that case. See comments of

Noyes, Circuit Judge, in the same entitled case, 202 Fed. 178–180, 120 C. C. A. 392. The presence of innocent interests at such time stamps the relation as one of trust and confidence, and the promoter is bound to make a full disclosure. Arnold v. Searing, 78 N. J. Eq. 156, 78 Atl. 762, and cases cited.

The instant case is very unlike the Lewisohn Case. Barber was not the owner of the properties conveyed to the company. The title thereof never lodged in him. He held only unpaid options. These he did not transfer to the company for a consideration, but left it to exercise them in his stead. His scheme contemplated the conveyance by the millers of their plants to the company direct, but not the payment of the consideration by the company directly to the millers. To transfer the options to the company, and to permit it to deal directly with the millers, would have enabled the contemplated new board of directors, to be composed mainly of these millers or their representatives, to readily ascertain what profits Barber received. The use of himself as a conduit through which the consideration was to flow from the company to the millers was necessary only to avoid disclosing his profits, and seemingly this was the only purpose he had in mind in having the stock of the company issued to him as agent.

Barber's scheme, in addition to being one to hide the profits he was contemplating, negatives the idea that he was to become the owner of the plants, or even financially obligated to the millers in any degree. It contemplated the financing of the deal by the millers and the outsiders. He worked on both. The more bonds and stock of the new company the millers could be induced to take, the less cash would have to be paid them as consideration for their mills. The more bonds and stock he could get the outsiders to subscribe for, the less cash he would have to raise in other ways to pay the millers the cash portion of the consideration for their plants and to pay into the company's treasury the $249,000 he was contemplating coupling with his offer to the company. If more cash than necessary for such purpose was realized from the millers and outsiders, that much more cash he would receive as part of his profits. His scheme has none of the earmarks of a purchase by him of property to be exchanged for the securities of a company. It was essentially a scheme to obtain from the millers and outsiders the cash part of the consideration that had to be paid for the mills and the $249,000 cash that was to be paid into the company's treasury. In the options Barber was called the purchaser. In fact, he never became so. In realty, he was but an exploiter of both millers and the company, and also of the confiding public, who were induced to part with their cash because of their belief in Barber, whom they knew as the head of a successful manufactory.

The subscription agreement, signed by the subscribers, calls for them to—

"agree severally, but not jointly, with Ohio C. Barber * * * to pay the amount of cash set opposite [their] respective signatures."

He signed one of these agreements, personally subscribing for $225,000 of the securities of the company. If, as contended, the stock he was offering in the prospectus was his own stock, why become a subscriber for any part of it?

His scheme employed a corporation, not as a vendee to trade its securities for properties owned by him, but solely as a clearing house to enable him to make a profit. As he did not at any time disclose to the corporation the price that was to be paid for the properties according to the terms of the options, he is liable to its receivers in this action if, at the time of the sale, there existed persons who bore to the company the relation of innocent stockholders (Yeiser v. United States Board & Paper Co., 107 Fed. 340, 46 C. C. A. 567, 52 L. R. A. 724; Old Dominion Copper Co. v. Lewisohn, 210 U. S. 206, 212, 28 Sup. Ct. 634, 52 L. Ed. 1025; Davis v. Las Ovas Co., 227 U. S. 80, 33 Sup. Ct. 197, 57 L. Ed. 426), unless the claimed estoppel is established. Literally, at the time of sale, no one but Barber's dummies were stockholders. But before that time, and for the purpose of becoming stockholders of the proposed company, the millers and a large number of outsiders had subscribed for a large amount of the stock to be issued by the company when it was organized. The outsiders had sent Barber, at his solicitation, their subscriptions, and he had made a call for the first payment due thereon, before he submitted his offer to the company on April 15th. The reports from the American Trust & Savings Bank show that a number of these outsiders responded to such call and paid the first installments of their subscriptions before the company accepted Barber's offer.

By such conduct he took upon himself the relation of a fiduciary, both to the company to be formed and to these subscribers. As noted, the company, at his direction, issued all of the 24,990 shares of its stock, mentioned in his offer of April 15th, to him as agent. On May 4th, immediately following the settlement with the millers for their plants, Barber then being the chairman of the company's directors, the company wrote a letter to the Merchants' Loan & Trust Company, the transfer agents, referring to the issue of stock to Barber as agent, wherein it is stated that—

"Mr. O. C. Barber, to whom the options were given, preferred to issue the stock to himself as agent in sufficient quantity to cover the amount required by the different plants, stating that he understood that in this manner the stock could be subdivided without expense of revenue stamps, as he, receiving the stock as agent, represented the several interests collectively."

Whatever may have been Barber's purpose for so doing, he took such shares, not as the absolute owner thereof, as is contended on his behalf, but as trustee. The cestuis que trustent were the millers, the outsiders, and the corporation. The interests of the millers and outsiders are measured by the amount of their subscriptions, and that of the company by the extent of the injury sustained by such of its stockholders as were ignorant of the trustee's wrongdoing.

The outside subscribers' relation to the company's stock so issued to Barber is radically different from that of the outside sub-

scribers of the stock in the Lewisohn Case. In the latter there were no such subscribers at the time of sale, and the court was dealing with a pleader's attempt to extend the doctrine of a promoter's liability down to a later time, when other subscriptions were made. Lewisohn and the syndicate associates at the time of sale were the only persons interested in the company or its purchase. On the pleaded facts of that case the Supreme Court said:

"Bigelow, Lewisohn, and their syndicate were on both sides of the bargain, and they might issue to themselves as much stock in their corporation as they liked in exchange for their conveyance of their land." 210 U. S. 212, 28 Sup. Ct. 636, 52 L. Ed. 1025.

In the instant case, at the time of the sale, there were persons interested in that transaction, whose interests as outside subscribers to the company's stock were adverse to Barber's interest as a promoter. The interests of these subscribers were not on both sides of the bargain, but solely on the purchasing side. Barber, who voluntarily assumed to act in a dual capacity, representing, not only his own interests, but those so adverse thereto, was not in a position to do as he pleased. His assuming such dual rôle made him a fiduciary, and his conduct is to be tested on that basis, and not as a vendor exchanging his property of one character for that of another.

Such of the outsiders who then had subscribed for the company's stock (hereinafter called equitable stockholders), as they were in Arnold v. Searing, supra, obtained a real interest in the stock which the promotion of this company contemplated would be issued when the plan outlined in the prospectus and subscription agreement had been carried out. They were the equitable owners of the shares of stock that then had been allotted to them, and at the instant the company's stock was taken over by Barber they became entitled to all the protection that a court of equity would accord to one who actually had the certificate of stock issued in his name.

[4] To these equitable stockholders, Barber was a promoter, and—

"Promoters of a corporation are bound to the exercise of good faith toward all the stockholders, to disclose all the facts relating to the property, and to select competent persons as directors, who will act honestly in the interest of the shareholders, and are precluded from taking a secret advantage of other shareholders." Dickerman v. Northern Trust Co., 176 U. S. 181, 20 Sup. Ct. 311, 44 L. Ed. 423.

This duty Barber did not perform. As noted, when Barber's proposal was made and accepted, there were no independent persons acting as directors of the company. They were all there to do whatever Barber wanted, and they did what he or his agents directed them to do. A week after Barber's offer had been accepted, and the company's stock and bonds had been ordered issued to him, all but one of these directors resigned; the remaining director continuing as such to satisfy the New Jersey statute that requires at least one director to be resident in that state. P. L. N. J. 1896, p. 281, § 12. The places of those who resigned, as well as the additional ones resulting from the increased number of directors authorized by the

company, were filled by real stockholders. Of these the millers or their representatives constituted a majority during the entire existence of the company. No formal or express disclosure of Barber's profits was made to them, or to any of their successors in office. So far as the millers are concerned, it is not necessary to consider whether the company could obtain a standing through them to maintain a suit of this character. They do not occupy the same position as the equitable stockholders referred to, whose innocent interests give the wronged corporation the right to bring the wrongdoer to book.

In the first negotiations for their properties, the millers occupied the position of prospective vendors. While they bore this relation to Barber, he was not legally required to disclose how much profit he intended to make out of the options that he was seeking to secure from them. They were struggling to maintain themselves against adverse business conditions. Self-interest occasionally brought them together, but this was not long continued. While in this situation, Barber began his negotiations with them. They were easily induced to give options on their plants. They first demanded all cash. If the consideration paid them had been all cash, they would have had no interest in what Barber did with the properties. That they subsequently were induced to agree to take stock and bonds of the proposed company as a part of the consideration for their property perhaps did not change the nature of their relation to Barber. They still might be called prospective vendors, and Barber a prospective vendee. If this be so, he was under no obligation voluntarily to disclose to them what profits he intended to make out of such options. They were always in a position to demand a full disclosure, and to refuse to give the options in case Barber declined to do so. That he was to make a profit must have been known by them, and some testified that they so understood. His requirement that they should not reveal what they each were to receive was readily agreed to, and seemingly they carried out that agreement.

However, the outside public, who before the incorporation of the company had been induced by Barber and his associates to subscribe for the stock of such proposed company, were in a different class from the millers. These by their subscriptions became original subscribers to the stock of this proposed company, just as much as did Barber by his subscription. With these Barber was not dealing at arm's length; to them he was a promoter, offering stock in a proposed company which was to take over the properties of these millers, intending (without disclosing such intention) to make a profit by such transaction. To such of them as had subscribed for the stock of this company, and had paid a portion of the amount due on their subscription at the time Barber's proposal was accepted by his dummy directors (and there were a number of such subscribers), he owed the duty of making a full disclosure, or, failing in that, to make it to an independent and competent board of directors of the company when formed. McKinley v. Williams (C. C. A. 8) 74 Fed. 94, 20 C. C. A. 312; Yeiser v. United States Board & Paper Co., 107 Fed. 340, 46 C. C. A. 567, 52 L. R. A. 724;

Gregg v. Megargel (D. C.) 248 Fed. 960; Davis v. Las Ovas Co., 227 U. S. 80, 86, 33 Sup. Ct. 197, 57 L. Ed. 426; Arnold v. Searing, 78 N. J. Eq. 146, 158, 78 Atl. 762; Parker v. Boyle, 178 Ind. 560, 99 N. E. 988. See, also, text and citations in 14 Corpus Juris, pp. 285, 286. He never made any affirmative disclosure to either.

However, it is contended that the transaction itself completely discloses that he was making a profit.

[5] First. *As to the alleged disclosure to the outside public:* The prospectus and subscription agreement were the source of their information, and these did not disclose Barber's plan or purpose of receiving profit. They did show that the expenses of organizing the company and the acquisition of properties would be paid out of the subscribed capital. But this, while undoubtedly including reasonable compensation in promoting the company, cannot be held to disclose the large profits that Barber contemplated and subsequently took. Whether or not we assume that these—prospectus and subscription agreement—were artfully drawn so as not to disclose that Barber contemplated the making a profit, the fact remains that they do not show what profits the promoters of this proposed company were to receive, or even that any promotion profits, as distinguished from compensation, were to be paid. Neither indicates that any persons but these millers were to be the vendors to the company; that there would not be any other offering of bonds and stock; that those then offered were not to be issued to the solicited subscribers by the company direct; that the entire proceeds thereof were not to be used in the purchase of the plants, etc., mentioned in the prospectus; or that a part of such proceeds was not to be retained by the company as the working capital referred to.

The declaration in the subscription agreement, that the capital—stock and bonds—totaling $4,500,000 was "to be issued as set forth in the prospectus of even date herewith for acquisition of plants and a working capital," and that the subscribers agreed with Barber and his associates, "and with each other, to pay the amount of cash set opposite our [their] respective signatures * * * as soon as subscriptions aggregating $1,000,000 have been secured hereunder, and under like papers," suggests the issue of stock and bonds to subscribers by the company direct, limits the use of such stock and bonds, or the proceeds thereof, to acquiring plants and to provide working capital, and negatives any idea that Barber was to be the vendor of the stock and bonds, or that he, or any other intermediary, was to make a profit in such transaction. The natural and ordinary meaning of this agreement is that the subscribers were becoming original subscribers to a joint enterprise, and that it was so understood by some of them is established by the evidence.

Indeed, the phraseology employed in both prospectus and subscription agreement, as undoubtedly the framers thereof intended, would have the effect of persuading the "confiding public," and all others not expert in promotion schemes, that here was a proffered opportunity to get in on the "ground floor" of an enterprise fathered and

recommended by Barber, who was well and favorably known by many of those solicited by him to subscribe for the bonds and stock of this proposed company. Rose Rosenberg, one of the outside subscribers, on April 5th sent in her subscription to a Mr. Herbert Wright, thanking him "for the opportunity of being able to get in." Barber, in 1901, as the prospectus stated, was the president of the Diamond Match Company, a large and successful business concern, and he permitted, if he did not cause, this prospectus to be worded as it was, and issued, with the subscription agreement referring to it, to the stockholders of that company. Letters written by him to some of such stockholders, thus circularized, leave no doubt that he intended they should know that he thought well of the prospective enterprise, and that it would be worth their while to become the holders of its stock and bonds. That some of the stockholders of the Diamond Match Company, thus circularized, were induced to subscribe for the stock and bonds of the proposed cereal company by reason of their faith in Barber, and because of his being the head· of the Diamond Match Company, is established by the evidence.

Robert M. Cox, writing from Liverpool, England, under date of March 12th, in response to Barber's letters of February 19th and 20th, already referred to, said:

"Your letter dated 19th Febr. to hand this day only; also your circular announcing the proposed formation of the 'Great Western Cereal Company.' I know nothing about this business, but I know you as president of the Diamond Match Company, and for that reason I inclose my signature for $5,000 subscription to the proposed company, say half in stock, accompanied by the stock bonus, and half in bond 6%. I shall be prepared to pay the 25% on allotment as soon as I receive particulars. It takes time to correspond across the Atlantic."

Subscribers to the stock of a proposed company, thus secured, and whose subscriptions are subsequently paid, bear a different relation to the company, when formed, both before and after its formation, than if they had purchased stock in a company already organized, from persons who were then the holders thereof. In the latter case the purchaser deals only with the holder in his individual capacity. If any actionable wrong results from such transaction, the remedy is individual, and not corporate. The vendee has no grievance against the company, and the company has no actionable grievance against the vendor, by reason of that transaction. However, in the former case, the subscriber deals with the promoter, not as a vendor selling his own stock, but as a trustee acting for the proposed company, a being already conceived by him and then progressing through the necessary period of formation. The breach of duty on the part of such trustee creates an additional remedy. The wrong is not confined to the individual subscriber; it affects the proposed company as well; and it obtains through such wrongdoing a right of action against the wrongdoer, unless barred by laches or other matter of estoppel.

[6] Second. *As to a disclosure to the corporation:* Barber's offer of the plants did not disclose his profits, and he never made

any such disclosure to the company at any later period. But it is said that the company's registrar—the American Trust & Savings Bank—who had a list of the company's stock and bonds and the millers' O. K. statements, knew it, or that from these it readily could have ascertained it at any time after May 3, 1901.

Upon the assumption that information thus obtainable is all the disclosure that a promoter is required to make, the insistence is that this bank was the "joint fiscal agent" of Barber, the company, and the subscribers for the company's stock—both millers and outsiders. Here the familiar rule that notice to an agent is notice to the principal is invoked. But the rule of constructive notice is not applicable to a situation like the one under consideration.

"The general rule, which imputes an agent's knowledge to the principal, does not apply when the third party knows there is no foundation for the ordinary presumption, and he is acquainted with circumstances plainly indicating that the agent will not advise the principal. The rule imputing agents' knowledge to the principal is intended to protect those exercising good faith and not as a shield for unfair dealing." Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 613, 36 Sup. Ct. 676, 60 L. Ed. 1202.

Barber was not such an innocent person. Before the company was organized, the bank was acting on Barber's behalf. The subscription agreement, which he caused to be sent out in advance of the incorporation of the company, directed that the subscriptions should be paid into this bank to his order. In his instructions to the subscribers, issued on April 11th, before he made any offer to the company, he directed them to pay their subscriptions into this bank. In his offer of the plants to the company, under date of April 15th, he directed that upon acceptance it should deliver the consideration—stock and bonds—to this bank, "to be by them delivered to me, or my nominees." This bank was not designated registrar of the company's stock until April 22d, before which, as noted, it was already receiving subscription moneys and acting on behalf of Barber in furtherance of his promotion scheme. The company's designation of it as registrar was by a board of directors which was still composed of Barber's dummies. The books of this bank, showing the receipts from subscribers to the company's stock and the disbursements from that fund, disclose that on April 30th Barber had deposited therein $200,000 (presumably a part of his personal subscription), and that the day after he was permitted to withdraw the same amount therefrom. Without more, an agent thus selected and acting will not be presumed to have communicated to the company the knowledge it acquired, or could have acquired, of Barber's profits—the only foundation for the rule herein invoked on Barber's behalf.

But there is more. The evidence discloses that Barber used this bank as one of his means to hide his profits. As noted, it was his, not the company's, or the outside subscribers', fiscal agent. That it later became also the registrar of the company in no way made it the company's fiscal agent, or changed its relation to Barber as his "wash house" to float the consideration required to carry out his

promotion scheme to make a profit through a manipulation of this company's capital. That this bank recognized that it bore a dual relation in this transaction, and that it did not consider itself under obligation to disclose to the company any of the information contained in any documents left with it by Barber or his syndicate associates or. agents, or which it obtained through any subscriptions received by it, is evidenced by its . refusal to permit Sawyer, shortly after the company was organized, and at which time he was the company's president, to see the lists of the subscribers or holders of the company's securities, without which it was impossible under Barber's scheme for any miller or outsider to ascertain his profits. And the assigned reason for such refusal—that it would be a breach of confidence—in the absence of contradiction shows that it considered itself under a duty to Barber not to permit such disclosure. Barber, as a fiduciary to the company and its stockholders, has no standing to invoke the rule which imputes to the principal knowledge acquired by his agent. The company could not tell from the prospectus and the subscription agreement, any more than could the persons who subscribed for its stock on Barber's solicitation, what Barber was to secure as a profit in the promotion of the company. That it, with other information, when obtained, would furnish a basis from which Barber's profit might be approximately ascertained, perhaps is true; but this is not the kind of disclosure that Barber was bound to give to protect him in his profits.

In dealing with this question, Lindley, M. R., in Re Olympia, Limited, L. R. 1898, 2 C. D. 153, 67 L. J. Ch. 433, said:

"To inform a person of a fact is one thing; to give him the means of finding it out, if he will take trouble enough, is another thing. A promoter of a company, whose duty it is to disclose what profits he has made, does not perform that duty by making a statement not disclosing the facts, but containing something which, if followed up by further investigation, will enable the inquirer to ascertain that profits have been made, and what they amounted to."

The doctrine here announced was approved and followed by Vice Chancellor Howell in Arnold v. Searing, supra, and in my opinion expresses the correct rule on this phase of the question of disclosure.

[7] Third. *As to the company's alleged ratification of, or acquiescence in, the profit:* A corporation may not condone, approve, or acquiesce in every wrong done it, differing in that respect from a natural person. If the injurious act done by an officer or director of the company is not merely voidable, but void, it cannot be ratified or condoned by the stockholders. They cannot make lawful acts which the statute has declared to be unlawful. Tooker v. Sugar Refining Co., 80 N. J. Eq. 305, 318, 84 Atl. 10.

[8] When the dummy directors voted the bonds and stock to Barber for an amount far in excess of the value of the plants, they were acting as Barber's agents. As he fixed the consideration that the company was to pay him for such plants, we have a plain case of a conscious overvaluation by him of the properties purchased by the company. This was a clear and deliberate violation of the New

Jersey statute, and ultra vires the corporation. Being so, it could not have been affirmatively approved, under the New Jersey cases, and what cannot be expressly ratified cannot be done impliedly. Therefore the claim that the company ratified or acquiesced in the transaction is not tenable.

[9] Are the company and its receivers estopped by laches to maintain this suit? A considerable time elapsed—12 years—from the time Barber made the undisclosed profit and the institution of the present suit. However, mere lapse of time does not constitute laches, but in the absence of explanation a long delay is evidence of it. In Bailey v. Glover, 88 U. S. 342, 22 L. Ed. 636, it was held:

"In suits in equity where relief is sought on the ground of fraud, the authorities are without conflict in support of the doctrine that where the ignorance of the fraud has been produced by affirmative acts of the guilty party in concealing the facts from the other, the statute will not bar relief provided suit is brought within proper time after the discovery of the fraud." 88 U. S. 347, 348, 22 L. Ed. 636.

See, also, Kirby v. Lake Shore & Michigan Southern R. R., 120 U. S. 130, 7 Sup. Ct. 430, 30 L. Ed. 569; 2 Pom. Eq. Jur. § 917.

In Pickens v. Merriam (C. C. A. 9) 242 Fed. 363, 155 C. C. A. 139, it was held:

"Laches is not a mere matter of time, but principally a question of the inequity of permitting a claim to be enforced because of some change in the condition or relations of the property or the parties."

In Humphreys v. Walsh (C. C. A. 3) 248 Fed. 414, 160 C. C. A. 424, it was held:

"In legal significance, 'laches' is not mere lapse of time, whether greater or less than the precise time of a statute of limitations; it is delay for such time as makes the doing of equity either impossible or doubtful, as involves the inequity of permitting a claim to be asserted after the death of parties, change of title, or intervention of the rights of others, where, in consequence, evidence has been lost or become obscured, the discovery of the truth is made difficult, and the party attacked is placed in a position of evident disadvantage."

As already observed, no miller or subscriber to the company's stock knew what was paid for the plants at the time the company acquired them. So far as the record discloses, no one but Barber, his attorney, Atterholt, and possibly Mr. Jones, who represented the American Trust & Savings Bank, possessed that knowledge. What was done with the O. K. statements at that time, which in the aggregate would disclose that fact, does not appear. In June, 1910, some of them were discovered by Sawyer in a bundle of papers handed to him by a trust officer of this bank, upon his request for a list of the persons holding the company's bonds. The bank's knowledge of what Barber made in promoting the company, as already found, not being imputed to the company, the question of laches before June, 1910, is narrowed down to whether in the circumstances this company was derelict in not making an effort at an earlier date to discover what profit Barber had made in such transaction.

In approaching this question, we should keep in mind that Barber, the wrongdoer, is here invoking the estoppel; that it was his method of carrying out the transaction that prevented a disclosure to the company at the time the company acquired the plants, and that his plan to prevent a disclosure of his profits was a continuous affair; that the company was dominated by him and the millers throughout all this period, some of whom are charged in the bill as his associates in this promotion scheme, and two of whom Barber in his answer asserts were his principals in such purpose. Except for the bank's refusal to let Sawyer know who were the holders of the company's bonds, coupled with the statement that such information would be a breach of confidence, there was nothing to suggest the need of making any inquiry of this character. Ordinarily one would say that a refusal to give to the president of the company information of matters which the company had a right to know, and particularly when such refusal is based upon the idea that to give the information would be a breach of confidence, would arouse the suspicion and challenge further inquiry. Sawyer, however, does not seem to have been so impressed. Whether this was due to an improper motive on his part (hardly likely), or in ignorance of the significance of such refusal (more probable), the fact is he did not deem such conduct and statement of the bank of sufficient importance to call it to the attention of the company's directors. His explanation for not paying more attention to the bank's refusal is that he secured sufficient information from other sources to meet the purpose of his inquiry.

While this is not a satisfying reason for Sawyer's failure to follow up such refusal by an insistence that the bank give him the information, it is well to note that Sawyer was one of the millers, who were said to be jealous of one another, and who readily acquiesced in Barber's refusal to tell what they were to receive for the plants. Even 10 years later, when he actually learned what had been paid to the millers, Sawyer did not disclose that information to any one connected with the company, other than Joy Morton, and that not until 3 or 4 months later. Both are charged by the bill as copromoters with Barber. Whether they were or not is not established. However, in view of Barber's answer, asserting that his efforts in the promotion of the company were performed at the request of Joy Morton and Atterholt, it is not necessary to determine Morton's relation to him. As far as Barber in the present inquiry is concerned, Morton occupied a fiduciary relation to this company and the innocent stockholders referred to; and so far as these stockholders are concerned, neither Sawyer's nor Morton's dereliction of duty to them can inure to the benefit of Barber.

According to Sawyer's testimony, his discovery in 1911 of what Barber obtained as profits in turning over the millers' plants to the company was a surprise—not that Barber had made a profit, but the largeness of it. In reporting his discovery to Morton, Sawyer says he thought that was all he should have done. If at this time the president of the company had been a person free from the taint of defrauding the company at its organization, the failure to prompt-

ly advise the stockholders of the company of the discovery that Sawyer had made would require more serious considerations. But, according to Barber's answer, Morton was not such, and for present purposes he cannot be so considered. Furthermore, there is nothing in the record that shows, or even suggests, that Barber has been prejudiced by the delay in bringing this suit.

In 1910, when Sawyer learned that the bank had some of the O. K. statements, the company was battling with adverse business conditions. Its officers still had hope of securing help from its bond-holders sufficient to tide it over its financial difficulty. This proved vain. On October 14, 1911, it issued the printed statement to its stockholders (hereinbefore referred to), showing that the company had been conducting a losing business for some time. This circular gave the first notice to the stockholders, other than Barber and his alleged promotion associates, of what had been actually paid for the mills.

In my judgment, it is only from this date—October 14, 1911—that the time began to run on the question of delay in bringing suit. Before that date no stockholder, or officer, or director, or agent of the company, whose knowledge could be imputed to the company, had notice that Barber had made more than a reasonable profit. The financial condition of the company at and from that time, the struggle of its officers to improve it, the passing of the company into the hands of a receiver on the ground of insolvency, the need of sufficient time thereafter for the receiver to become thoroughly acquainted with its condition, and of the facts underlying a possible suit to recover the undisclosed profits, sufficiently accounts for and excuses the delay that ensued in the bringing of suit.

In view of Barber's legal duty to positively apprise the company of the profits he was making in such transaction, his purpose that such profits should be kept secret, his successful plan to prevent an early disclosure thereof, the dominance that Barber personally exercised over the company's directors during the first years of the enterprise, the continuance of a like dominance by Morton, who, as far as Barber is concerned, must be treated as exerting such dominance to maintain the secrecy of such profits, and the absence of evidence showing that the delay in instituting suit against Barber has prejudiced him in his defense, the charge of laches must be held not sustained.

[10] *As to the remedy:* The remedy for such wrong done the corporation is not single—a rescission of the contract and a restoration of the status quo—as contended on Barber's behalf. To restore the status quo may not be possible. In the case of a solvent going concern that would be practical, and usually the more equitable; but in the case of an insolvent corporation to recover or cancel the stock—now become worthless—would not be a remedy for the wronged corporation and its creditors, but an immunity for the wrongdoer. In Yeiser v. United States Board & Paper Co., supra, it was said (107 Fed. on page 349, 46 C. C. A. 576, 52 L. R. A. 724):

268 F.—39

"With regard to the kind of relief which should be awarded, it must be adapted to the situation at the time when it was applied for; that is, when the suit was commenced."

For further citations see 14 Corpus Juris, pp. 297–301. In case of insolvency, the remedy inures to the creditors and may be enforced by receivers. What the promoters unjustly gained is to be restored for the benefit of the creditors. This may be accomplished by recovering such gain in gross, or by an assessment of the stock, as unpaid in favor of such creditors. See v. Heppenheimer, 69 N. J. Eq. 36, 61 Atl. 843; Bigelow v. Old Dominion Copper, etc., Co., 74 N. J. Eq. 502, 71 Atl. 153. See, also, McKinley v. Williams (C. C. A. 8) 74 Fed. 94, 20 C. C. A. 312.

The plaintiffs are entitled to a decree for an accounting against the estate of the defendant Ohio C. Barber for the whole amount of his profits in the promotion of the Great Western Cereal Company, and for a reference to a master to ascertain such profits, unless the amount thereof can be agreed upon.